STATE OF WEST VIRGINIA

*v.*

GLEN N. BOWMAN, SR.

(No. 12968)

Submitted September 7, 1971.   Decided November 2, 1971.

Rehearing Denied December 14, 1971.

*Rudolph DiTrapano, Robert G. Perry,* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *George E. Lantz,* Deputy Attorney General, *Willard A. Sullivan,* Assistant Attorney General, for defendant in error.

CARRIGAN, JUDGE:

This is an appeal by Glen N. Bowman, Sr., appellant, hereinafter referred to as defendant, from a final order of the Kanawha County Circuit Court entered October 28, 1969, refusing a writ of error and supersedeas to a final order of the Kanawha County Intermediate Court entered June 13, 1969, sentencing the defendant to confinement in the West Virginia Penitentiary for the rest of his natural life.

The evidence in this case discloses that defendant and Hart, the victim of this killing, occupied adjoining houses apparently in close proximity to each other. Neither defendant nor Hart had ever visited the other's home and had only exchanged greetings and casual conversation prior to the middle of June, 1968. Near daylight one morning in the middle of June, a dog fastened in the Hart yard was barking, and defendant, from his yard, threw pieces off dirt at the dog in, as he says, an attempt to stop the barking, at which time a male voice from the Hart residence made some remark concerning the treatment of the dog but said he would get someone down to take care of the dog. Shortly thereafter, a member of the Hart household brought the dog into the Hart house, and no other incident arose concerning the dog. Defendant claims he thought the voice was that of the victim, Hart, but testimony shows that the voice belonged to the victim's father.

No further incidents occurred between the Bowman and Hart families until September 18, 1968, some three months after the dog incident. On Wednesday, September 18, at about 2:30 or 3:00 p.m., defendant's wife observed the victim, Hart, digging dirt from between the Hart and Bowman houses. A conversation ensued between defendant's wife and Mr. and Mrs. Hart concerning the location of the property line between the two houses and whether Hart had been digging on the Bowman property. Apparently this conversation started in a friendly manner, since defendant's wife said Hart was laughing. Later defendant's wife again challenged Hart concerning the property

line and the hole between the houses and she stated Hart's little boy had previously dug holes there which her husband had to fill. Defendant's wife then testified that Hart became angry and told her that what his little boy did was his business and "he planned to get his brother up there that night to settle that with my husband" (meaning defendant). During all of this conversation the defendant was away from home. The testimony fails to show that either Hart or his brother appeared or had any conversation with either defendant or his wife on that Wednesday or at any later date, and nothing further occurred concerning this particular incident.

On Saturday, September 21, 1968, being some three days following the discussion between defendant's wife and Hart about the digging between the houses, a birthday party for the four-year-old Hart child was in progress in the Hart house. Some of the children were outdoors playing, and one of them came into the Hart home crying, whereupon Mrs. Hart went outdoors to discover what had occurred. Mrs. Hart saw her little son in the Bowman yard and ordered him to come home and to stay out of the Bowman yard. Defendant's wife, then being in her house, walked out onto her porch and complained to Mrs. Hart about the manner in which she called her son home. The defendant then came out on his porch and engaged in the conversation between his wife and Mrs. Hart. The exact nature of this conversation is in conflict, but even adopting defendant's version, Mrs. Hart told them she would speak to her children as she pleased and said to both Bowmans, "How would you like to go straight to Hell?" No threats were made by Mrs. Hart that she would have her husband take any action against defendant or his wife as a result of the above outlined dispute. The victim, Hart, not being present took no part in this dispute.

About ten minutes after Mrs. Hart returned to her house and while she was upstairs in a bedroom attending her baby, her husband, the victim, came home. He was in a "good humor" having just been awarded a financial prize at his work. He spent a short time greeting those in the

house, and during this period Mrs. Hart told her husband about the incident with defendant and his wife and the children. Shortly thereafter, Hart went downstairs and Mrs. Hart continued to attend her baby.

The testimony of defendant and his wife, which must be considered as being given in a light favorable to defendant, shows that following the incident with Mrs. Hart, defendant and his wife went into their living room. Defendant claims that, because of the prior incident on September 18 between Hart and defendant's wife and the September 21 incident between the Bowmans and Mrs. Hart, he was fearful of what Hart might do. Defendant then went into a bedroom, got a pistol and returned to the living room, sitting down by the front door which opened onto the front porch. Defendant's wife was also present in this room. The front screen door was closed but not locked, and the inside front door was open. Defendant and his wife testified that they heard rapid or running steps coming up their front outside stairs, that they did not know who was coming, and that they observed the victim crossing their front porch moving very rapidly and reaching out in the direction of the front door, it not being clear whether the victim touched the door or its knob or with which hand he reached for the door. The victim did not enter defendant's house. The defendant and his wife testified that the victim appeared bent over and in a rage. It is undisputed that the victim was not armed in any manner. No words of any kind were spoken by defendant, his wife or by the victim at this time. On seeing the victim, defendant fired two shots through the screen door. The first shot inflicted a superficial wound on the victim's head, the bullet then traveling 300 to 400 yards and penetrating into a house, and the second shot entered the victim's back near the shoulder causing injury to the heart and liver and massive bleeding. Hart, the victim, apparently managed to return to his front door where his wife found him dead.

There is some testimony that either the defendant or his wife phoned the police and for an ambulance. However, it is not disputed that neither the defendant nor his wife went outside to aid Hart or to see anything about the injury inflicted by the shots. It is also undisputed that after firing the two shots the defendant reloaded his gun and had it in his pants pocket when arrested shortly after the shooting.

While defendant urges numerous points of error in his trial, great stress was placed upon the point that the verdict of first degree murder returned against him was not warranted by the evidence.

Code, 61-2-1, as amended, defines murder in the first degree as murder by poison, lying in wait, imprisonment, starving or by any *wilful, deliberate and premeditated killing,* or in the commission or attempt to commit certain felonies enumerated therein.

A reading of all the testimony in this case leads us to believe that the verdict of the jury of murder in the first degree was correct based on the evidence and circumstances of this case and is amply supported by the evidence. *State* v. *Zink,* 98 W.Va. 340, 128 S.E. 114 (1925). Here we have a man, the defendant, who obtained a loaded gun and sat with it by his front door waiting for the victim, or someone, to approach, and, who, upon hearing approaching footsteps, fired two shots in succession almost before he recognized the victim, the mortal shot hitting the victim in the back. The defendant, after the shooting, took no steps to ascertain the extent of the victim's injury or to render aid, but proceeded to reload his gun and await further action. These actions of the defendant would certainly justfy the jury in finding both premeditation and malice on the part of the defendant. Defendant's actions speak louder than any words.

The defendant attempts to rely upon self-defense, but the elements of self-defense are so lacking that the jury could reasonably, under the facts of this case, find that

there was no self-defense of defendant or his wife involved. Surely the incident of the dog some three months before the shooting, or the September 18 incident between defendant's wife and the victim, which defendant's wife considered a threat (if in fact it was such, and which is susceptible of two interpretations) or even the exchange of words between defendant, his wife and Mrs. Hart on the day of the shooting, could not be considered threats by the victim against either defendant or his wife. At the time of the shooting no threats (in fact, no words) were spoken by the victim. Hart, the victim, is dead, and there are no unbiased witnesses, leaving only the defendant and his wife to tell their side of what happened immediately prior to the shooting.

A reading of the cases of *State* v. *Preece,* 116 W.Va. 176, 179 S.E. 524 (1935); *State* v. *Laura,* 93 W.Va. 250, 116 S.E. 251 (1923); *State* v. *Clark,* 51 W.Va. 457, 41 S.E. 204 (1902); and *State* v. *Manns,* 48 W.Va. 480, 37 S.E. 613 (1900), cited by defendant, as well as other cases dealing with self-defense show that these cases are distinguishable from the instant case, in that in those cases there was either some violent action taken or threatened coupled with spoken threats of some violent action, while in the instant case the victim made no threats and his only "violent" actions were to come on defendant's porch at a rapid pace and reach toward the door.

We have carefully examined the various instructions given or refused and objected to by defendant and find no error in the action taken by the trial court.

Defendant objects to the admission of testimony as to the alcoholic content of victim's blood and the interpretation of such content. This subject was first introduced into this case by defendant, and if this be error, the defendant who induced the same should not be permitted to complain. *State* v. *Ruble,* 119 W.Va. 356, 360, 193 S.E. 567, 569 (1937); *State* v. *Snider,* 81 W.Va. 522, 529, 94 S.E. 981, 984 (1918); *State* v. *Taylor,* 57 W.Va. 228, 245, 50 S.E. 247, 253-54 (1905).

Defendant complains of the court's failure to declare a mistrial because of improper argument of the prosecuting attorney. In argument, the prosecuting attorney either read or quoted, it not being clear from the record, a part of a proper instruction given in this case. Objection was made by defendant's counsel, and overruled. However, the prosecuting attorney did not further pursue the text of this instruction. Rule VI(a) for Trial Courts of Record provides that counsel may not "*read* the instructions to the jury." (Emphasis added.) Defendant also objects to the prosecuting attorney's remarks in closing argument as to amount and effect of the alcoholic content of the victim's blood, which subject was first introduced by defendant, as previously mentioned.

Since the instruction read or quoted by the prosecuting attorney had been given by the court and was a correct instruction, we see no prejudicial error. This Court, in *Esque* v. *Huntington,* 104 W.Va. 110, 139 S.E. 469 (1927), condemned the reading of law to the jury but held that the reading of correct and relevant law is not cause for reversal. Perhaps in this case the offending attorney should have been reprimanded or otherwise dealt with by the court outside the hearing of the jury. The "inflammatory remarks" of the prosecuting attorney, if such they be, were considered by the trial court and found not to be prejudicial to defendant. This is the tenth syllabus point of *State* v. *Bail,* 140 W.Va. 680, 88 S.E.2d 634 (1955):

> The discretion vested in a trial court to determine whether a defendant in a criminal case has been prejudiced by statements of counsel for the State, during the trial, will not be interfered with by an appellate court unless it clearly appears that the discretion has been abused.

*See also,* Syllabus, Point 7, *State* v. *Lewis,* 133 W.Va. 584, 57 S.E.2d 513 (1949).

For the foregoing reasons, the final order of the Circuit Court of Kanawha County refusing defendant's writ of error and supersedeas is affirmed.

*Affirmed.*