396 S.E.2d 751

**STATE of West Virginia**

v.

**Ronald Dale BENNETT.**

No. 19034.

Supreme Court of Appeals of West Virginia.

July 25, 1990.

---

**572**

W.A. Thornhill, III, Beckley, for Ronald D. Bennett.

Roger W. Tompkins, Atty. Gen., Thomas J. Gillooly, Deputy Atty. Gen., Atty. Gen.'s Office, Charleston, Kristen Keller, Chief Deputy Prosecutor, Beckley, for State of W.Va.

PER CURIAM:

This case is before the Court upon the appeal of Ronald Dale Bennett from a December 8, 1988 jury verdict in which the appellant was convicted of first degree murder without a recommendation of mercy in the Circuit Court of Raleigh County. The appellant assigns the following as errors committed by the lower court: 1) the trial court erred in permitting Bennett's psychiatrist to be cross-examined by the State on the subject of the American Medical Association recommending that the insanity defense be abolished; 2) the trial court erred in permitting the State to argue to the jury that the insanity defense should be abolished; and, 3) the trial court erred in failing to grant Bennett's motion for a mistrial because of the prejudicial testimony of the witness, Glenda Willis, that Bennett had tried to kill his first wife. Based upon a review of the record in this case, we find that the lower court committed no reversible error and affirm the appellant's conviction.

On May 9, 1988, it is undisputed that the appellant, using a .25 caliber revolver, fired three shots [1] into his estranged wife, Virginia Bennett, which fatally wounded her. The evidence indicated that the appellant waited until his daughter and son-in-law left the victim's home and then shot his wife as she sat at the kitchen table. There was no evidence of a struggle. The appellant then drove to his uncle's home where he announced that he had shot his wife. The appellant was later arrested at his uncle's residence. At trial, the defendant's defense was insanity.

The facts leading up to the shooting present a tragic backdrop to the issues before us. It was undisputed that the victim, Virginia "Penny" Bennett, was a good and decent person. She was the defendant's second wife, the mother of the one child born of their marriage, and the only mother the children from his first marriage had ever known, she having married the defendant when the two children from the prior marriage were very young.

Testimony at trial revealed that during the eighteen years the victim and defendant were married, the victim was a dutiful wife and mother despite the fact that defendant was a sullen, high-tempered, domineering individual. All three children and the defendant's sister testified that Penny never argued or raised her voice to the

---

1. The evidence indicated that one shot entered the victim's head in a downward path, the next shot entered the victim's breast, and the last shot entered through the victim's throat.

defendant and was always obedient to his wishes. She was a full-time mother and homemaker until the youngest child was in seventh grade, and then went to work out of economic necessity, despite the fact that defendant earned a good income as a steelworker.

The testimony from defendant's own family members reflected that he was regarded as the "black sheep of the family", having always exhibited a quick temper and signs of meanness, hatred and anger to the point that it was known by many of the witnesses who testified that both the victim and other family members were fearful of him. The appellant did not spend much time at home, electing instead to stay in Cleveland, Ohio, much of the time.

The evidence at trial indicated that problems in the marriage became aggravated for approximately one and one-half to two years prior to the murder. In March 1988 an incident occurred which caused the victim and youngest daughter to flee the marital home. During the weekend of March 4, 1988, the defendant discovered that the sixteen-year-old daughter, Darlene, who had been working at a fast food restaurant while attending high school, was filing an individual income tax return. The defendant became extremely angry that this would deprive him of his ability to claim her as a dependent on his return. He proceeded to whip the girl from room to room with a belt. When the mother attempted to intervene on her daughter's behalf, the defendant became enraged at her disobedience. The incident culminated with defendant telling his wife and daughter he was going to Ohio and if they weren't out of the house by the time he returned, he'd kill them both. Testimony from the defendant's sister, daughters, and other family members indicated that the victim and Darlene took the threats seriously, and with the help of these family members, fled the home quickly. They initially stayed with the defendant's sister and her husband, who kept them in hiding. After a short period, the victim and Darlene moved to a house in Beckley owned by the defendant's mother and stepfather. They and the relatives continued to be concerned for their safety. The sister and brother-in-law gave the victim a .22 revolver for their protection, and the victim took the precaution of driving her sister-in-law's car and hiding her own in the garage.

Upon his return from Cleveland, the defendant became extremely angry that his family had helped and harbored the victim. He threatened at one point to kill all of them.

In mid-March, defendant found out where the victim was hiding. He thereafter frequently continued to show up uninvited, attempting to get the wife and daughter to return. During this same period, he told a number of his family members and his friend, Glenda Willis, that he would kill his wife, even if he had to go to the penitentiary.

This evidence of defendant's behavior prior to the shooting was of consequence due to the fact that his defense was insanity; and because his chief witness at trial, Dr. Ahmed M. Faheem, a psychiatrist who first examined him five months after the shooting, testified that the history he took from the defendant himself was extremely important in making his diagnosis and forming the opinion that at the time of the shooting the defendant was suffering from mental illness which rendered him incapable of understanding and appreciating the wrongfulness of his act or of conforming his actions to the law. Much of that self-reported history dealt with the defendant's behavior prior to the shooting.

According to Dr. Faheem, the defendant reported that prior to the shooting he had spells of crying and breaking down; had difficulty sleeping and eating; had suicidal ideations and had heard voices. He further reported to the doctor that he could not remember shooting his wife. The defendant also reported to the psychiatrist that even within two months of her death the victim apparently indicated the appellant needed medical help, but the state's testimony revealed that his wife was not urging this medical attention because she believed him to be crazy or insane, but rather out of fear for her safety and because of the

anger and dominance he had exhibited his whole life.

Further, Glenda Willis a friend of the appellant's for seventeen years, testified without objection from the defense, that the appellant had discussed the insanity defense with her prior to May 9, 1988, together with the fact that it could be utilized to avoid conviction on murder. She further testified that during her relationship with the appellant, he had not displayed any symptoms of mental illness.

Evidence introduced at trial also included a holographic will found in the victim's purse at the crime scene. The will provided the following:

> March the 17th, 1988. Last will and testimony of Virginia Bennett. If I['']m killed, my husband did it. If I die I don't under in [sic] condition want a open casket. No wake, no funeral. Just a private burial with family only. To my family [and] kids: I love you. I've done no wrong. Take care of each other and stick together. Together with love and God you can overcome anything. Don't grieve for me. All I ever asked God for was to live to see you kids grown. God granted me my prayer. I can[']t bargain for more.

Following the shooting and in preparation for trial, the appellant was examined by a defense psychiatrist, Dr. Faheem, and a state psychiatrist, Dr. Snyder. Both psychiatrists found the appellant to be suffering from severe or major depression. However, Dr. Faheem found that the depression was associated with psychotic features and concluded that the appellant could not have been criminally responsible for the murder of his wife. The state's psychiatrist disagreed with Dr. Faheem's diagnosis and conclusion.

At the close of all the evidence, the jury deliberated and returned a verdict of guilty of murder in the first degree without a

recommendation of mercy. They also concluded that the crime was committed with a firearm. The appellant was sentenced to life imprisonment without parole.

## I.

■ The appellant's first assignment of error centers upon the cross-examination of the appellant's psychiatrist by the state. During the cross-examination of Dr. Faheem the prosecutor attempted to impeach his testimony by casting aspersions on the doctor's testimony concerning the use of psychiatric postdiction[2] in this case. The prosecutor utilized an article which appeared in the September 1985 issue of the American Journal of Psychiatry which discussed the American Medical Association's position that the insanity defense was not a valid medical and psychiatric defense.

The appellant contends that the abovementioned cross-examination improperly placed before the jury the suggestion that the insanity defense should be abolished as a legal defense. The appellee, on the other hand, argues that a psychiatrist who testifies that there is general agreement in the scientific community as to the validity (medically or psychiatrically) of an insanity defense based upon psychiatric postdiction may properly be impeached by reference to an authoritative publication of the American Medical Association recommending abolition of such defense.

■ It is unquestionable that W.Va.R. Evid. 803(18) provides for the use of authoritative treatises[3] in the cross-examination of expert witnesses. The rule specifically states that:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (18) Learned Treatises.—To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, state-

---

**2.** Psychiatric postdiction, according to the testimony of Dr. Faheem, is when a psychiatrist evaluates a person after a crime and then tells a jury what was in that person's mind at the time of the crime.

**3.** There was never any objection raised by the appellant involving whether the position paper at issue was indeed an authoritative treatise for the purposes of the rule. It is evident after reviewing the expert's testimony, that he was familiar with the paper and had read it.

ments contained in public treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

*Id.* Further, we held in Syl. Pt. 3, *Thornton v. CAMC, Etc.*, 172 W.Va. 360, 305 S.E.2d 316 (1983) that "[w]here a treatise is recognized by a medical expert witness as authoritative, then he can be asked about its statements for purposes of impeachment during cross-examination."

■ After reviewing the pertinent portions of the expert's testimony in this case, it is clear that the prosecuting attorney acted appropriately in conducting the cross-examination of the expert utilizing the article from the American Journal of Psychiatry, for such an article does qualify as a learned treatise for the purposes of the rule. The prosecutor was merely attempting to bring into doubt the psychiatrist's use of postdiction in diagnosing insanity in this particular case. It is also clear that the trial court acted properly in allowing utilization of the treatise in such cross-examination. *See* W.Va.R.Evid. 803(18).

The cross-examination did not encroach upon a legal question, for the question placed before the expert involved whether the defense was medically and psychiatrically valid, *not* legally valid[4]. Thus, the impeachment of the expert via the learned treatise exception did not place a legal issue before the jury. Furthermore, the expert handled himself quite proficiently in his response to the prosecutor's question and was effective in minimizing any weakening or damage that the state's cross-examination attempted to cause to his testimony.

**4.** We also note that the jury was properly instructed as to the law regarding the insanity defense as it exists in this state. *See* footnote 6 *infra.* Further, the jury was instructed: "Do not select any one instruction or statement therein and ignore other instructions or parts of other instructions. You are to receive, accept, consider and apply these instructions together as a

## II.

■ The appellant's next assignment of error involves remarks made by the prosecutor during her closing arguments to the jury. In particular, the appellant contends that the appellee made the following improper remarks to the jury:

Doctor Faheem may be fine in treating people or prescribing medicine but I submit to you that upon all of his testimony he is unbelievable. He is boss. And is an example of why the American Medical Association urges that the insanity defense be abolished.

Mr. Thornhill: I object, Your Honor, that's not an issue before the Court, whether that's to be abolished.

The Court: It is—I'll instruct the jury that it is not an issue but I will allow the comment to stand because it was brought out in the testimony.

Ms. Keller: And of course this same American Medical Association and American Psychiatric Association—by the way Doctor Faheem, he first had to admit, yes, this was an authoritative statement—the American Medical Association and APA in 1985 who found there was no correlation between mental illness and crime.

Mr. Thornhill: I object, Your Honor. If the Court, the jury is to be instructed on the insanity defense, this is improper argument.

The Court: I believe the jury can sift through the argument that is being made under the instruction of the Court. I will overrule the objection. But it will be, of course, couched in the terms and the jury will consider it in terms of the instructions as to the law and to the conditions in which would find the person not guilty by reason of insanity or by the same

whole.... The law applies to all of us and as jurors you are sworn to follow these instructions as to the applicable law. *As jurors you have no right or privilege to disregard these instructions or form your own different opinion as to what the applicable law is, or ought to be."* (emphasis added)

token and by the same standard find him to be sane.

Additionally, the prosecutor also commented in the rebuttal portion of her closing argument: "Do not turn this into a war between Doctor Snyder and Doctor Faheem. If you want you could ignore them all. You could agree with the AMA and say that none of them should be up here. Because we have the people who saw the defendant on May 9th, 1988." [5]

The appellant argues that the argument made by the appellee in closing was improper not only because it was based on improper cross-examination but also because it was in direct conflict with the court's instructions on the insanity defense. The appellee contends that there was no argument made to the jury advocating that the insanity defense be abolished but that the prosecutor was merely restating the fact that the AMA did not believe that the insanity defense was viable from a medical perspective. The appellee further argues that when a psychiatrist in an insanity defense case is impeached by such an article, such testimony may be properly mentioned in closing argument.

The appellant relies upon Rule VI of the West Virginia Trial Court Rules for Trial Courts of Record (hereinafter cited as W.Va.Tr.Ct.R.). That rule provides, in pertinent part, that "[c]ounsel may refer to the instructions to juries in their argument, but may not argue against the correctness of any instruction( ).... [Additionally,] [c]ounsel may not comment upon any evidence ruled out, ... nor contend before the jury for any theory of the case that has been overruled." W.Va.Tr.Ct.R. VI(a).

Considered alone, this last portion of the prosecutor's argument, telling the jury they can "ignore them all" and "agree with the AMA and say none of them should be up here ..." would appear not only overzealous, but possibly violative of this rule. However, a close review of the whole record in this case does not reveal that the prosecutor's closing argument was improper. Viewed in the entire context of the cross-examination, it becomes clear that the prosecutor's argument dealt with the validity of the defense from a medical and psychiatric standpoint. When the insanity defense is invoked, its validity from that standpoint as to the particular defendant is, after all, the real issue. It is also important to note that the jury was properly instructed on the law regarding the insanity defense.[6] Further, the prosecutor in closing referred to the legally correct definition of insanity [7] and, finally, the appellant also referred to the testimony elicited by the psychiatrist during cross-examination and attempted to counter that testimony during his closing.[8]

---

**5.** This particular remark made by the prosecutor was not objected to by the appellant's counsel at trial.

**6.** The court instructed the jury as follows:

The jury is instructed that an accused is not responsible for his act if, at the time of the commission of it, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act, or to conform his act to the requirements of law. Therefore, unless you believe from the evidence beyond a reasonable doubt that at the time of the shooting of Virginia Bennett by the defendant, Ronald Bennett, such act was not the result of a mental disease or defect causing Robert Bennett to lack the capacity either to appreciate the wrongfulness of his act, or to conform his act to the requirement of the law, then your verdict must be NOT GUILTY by reason of insanity.

**7.** Specifically, the prosecutor argued in closing that

I told you in the beginning we never, never contend the man who has committed a first-degree murder is a normal or well-adjusted person. If he were he would not have murdered.

But listen to the definition. Very important. It is not was he mentally healthy or mentally ill. It is this: In order for you to excuse this you must find that first degree, that this killing of Virginia was caused by, was caused by a mental illness. Such a degree of mental illness that this man does not have the capacity, does not have the ability to know it is wrong to kill, does not have the capacity to obey the law.

**8.** The appellant's counsel at trial made the following references to the psychiatrist's testimony:

[P]art of their case is to prove beyond a reasonable doubt that Ronald Bennett was not suffering from mental illness or that that mental illness didn't keep him from under-

In Syl.Pt. 9, *State v. Flint*, 171 W.Va. 676, 301 S.E.2d 765 (1983), this Court reiterated the principle that " '[t]he discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom.' " *Id.* 171 W.Va. at 687, 301 S.E.2d at 776 (quoting Syl.Pt. 3, *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927)); cf., *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988). Consequently, we find that the remarks made by the prosecutor in closing neither prejudiced the appellant nor created a manifest injustice.

The appellant argues that the trial court erred in allowing the following remarks to be made by the prosecutor at trial:

> Ms. Keller: It was stated many times by the defense lawyer that many people don't like the insanity defense and perhaps one of the reasons people don't like the insanity defense is because as Mr. Bennett told his friend Glenda, "Everyone knows you can buy a psychiatrist to say you're crazy and then the other side buys a psychiatrist—
>
> Mr. Thornhill: I object. That was not the testimony.
>
> . . . .
>
> The Court: We'll let the jury determine whether it was or was not the testimony. Objection is overruled with that admonition.
>
> The actual testimony of Glenda Willis was:
>
> A: When there was, uh, an incident once where a paper girl was killed in our hometown, you know, and one of the men was on trial and one was taken over to Mexico and they couldn't bring him

back and he (the defendant) was talking about how people could just say they were crazy and walk out of the courtroom and do it again.

Applying the law cited above in *Flint*, we find the harm which may have come from the prosecutor's misquote of the testimony to be inconsequential and therefore, determine that the lower court committed no abuse of its discretion in its ruling on the matter. 171 W.Va. at 687, 301 S.E.2d at 776. When a dispute occurs between counsel during argument as to the characterization of testimony heard during trial, the trial court may properly advise the jury that it is their prerogative to rely on their own memories in determining what the testimony was and in accepting or rejecting argument thereon.

### III.

The final assignment of error involves testimony elicited by the appellant during cross-examination of the appellee's witness, Glenda Willis. After the testimony of the witness, the appellant moved for a mistrial which was denied by the lower court. Specifically, the error alleged by the appellant is that prior to trial, the court granted appellant's motion in limine and thereby prohibited the appellee from introducing into evidence the 1967 shooting by the appellant of his first wife. However, during recross-examination of Willis by the appellant the following exchange took place:

> Q: The difference was that never before in seventeen years had you ever heard him say he was going to kill anybody; isn't that right? Is that true?
>
> A: Do I have to tell the truth?
>
> The Court: You've been asked to do so and sworn to do so, ma'am, so, tell the truth.

standing the wrongfulness of his act or did not, did not keep him from, from being able to conform to his actions in accordance with the law.

Now if they don't prove all of that then there is a particular verdict that the, you must return. And you do so even if like one of the members of this jury said when you-all were being questioned, said, "I've got some con-

cerns or some reservations about it." Nobody else said they had reservations about it.

But that is a psychiatric or insanity defense that the law of this country has and unless and until it's changed that's the law whether you're fond of it or I'm fond of it or the Judge likes it. And that's the law that you operate in Ronald Bennett's case and apply.

By Mr. Thornhill (resuming):

Q: Is the truth different from what you told us awhile ago?

A: Ronnie Bennett told me that an accident happened, an incident happened in 1967.

Q: Now that isn't responsive to the question.

A: You asked me a question, do you want me to answer it or do you not? You asked me had he ever mentioned killing someone in my home.

Q: I, I certain—

A: Do you want me to answer it or you don't?

Q: I, I want.

A: He talked about his first wife and he talked about how he had shot his first wife. She wanted a divorce; she wanted his children. He wasn't going to let her have them. He told me that he shot his wife. He told me that he raped his wife. He told me that he drove and drove and drove with her in a car with him and that he decided he'd have himself a beer and when he finished his beer he was going to finish her off. He said and the police came before he could do that and put a gun to his head and put him under arrest.

In appellant counsel's argument before the lower court in support of his motion for mistrial, he stated the following: "the testimony of Glennis Webb [sic] on yesterday, whose very damaging testimony on yesterday, I am painfully aware, was elicited by a question from me." The lower court in its ruling found the error to be "defense induced" and then gave the jury the following instruction: "The jury is instructed that the testimony of Glenda Willis referring to the shooting of a previous wife of Ronald Bennett should not be considered by you in this trial for any purpose."

The appellant contends that there was no proper disclosure to the appellant by the appellee regarding what the witness knew and that the answer by the witness was not responsive to the appellant's question. Thus, the lower court erred in refusing to grant a mistrial. The appellee, on the other hand, contends that the answer was invited error on the part of appellant and therefore, the trial court was correct in its ruling which denied the appellant's motion below.

In Syl.Pt. 2, *State v. Bowman*, 155 W.Va. 562, 184 S.E.2d 314 (1971), we held that "[a]n appellant or plaintiff in error will not be permitted to complain of error in the admission of evidence which he offered or elicited, and this is true even of a defendant in a criminal case." *Accord*, Syl.Pt. 1, *State v. Compton*, 167 W.Va. 16, 277 S.E.2d 724 (1981). Likewise, this Court held that "[o]rdinarily where objections to questions or evidence by a party are sustained by the trial court during the trial and the jury instructed not to consider such matter, it will not constitute reversible error." Syl.Pt. 5, *State v. Haller*, 178 W.Va. 642, 363 S.E.2d 719 (1987) (quoting Syl.Pt. 18, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966)).

The exchange at issue certainly reveals that defense counsel should have recognized not only by the witness' questions to him, but also by her hesitancy in answering him, the very area he was leading her into. Furthermore, the witness' hesitancy and failure to answer immediately gave counsel ample opportunity to change courses with the witness, or even to have approached the bench to seek a cautionary directive to her not to testify concerning the previous shooting.

Thus, we have determined from our review of the record in this matter, that the evidence was clearly introduced by the appellant and was therefore invited error from which the appellant is precluded from taking advantage on appeal. Further, the trial court ruled properly in deciding the motion for mistrial and in its attempt to correct the damage caused by the appellant by instructing the jury that it could not consider the testimony brought in by the appellant in its deliberations.

Based upon the foregoing opinion, the decision of the Circuit Court of Raleigh County is hereby affirmed.

Affirmed.