619 S.E.2d 104

**STATE of West Virginia, Plaintiff
Below, Appellee,**

v.

**Alfred GRAY, Defendant
Below, Appellant.**

No. 32051.

Supreme Court of Appeals of West Virginia.

Submitted: May 10, 2005.

Filed: July 6, 2005.

Kristen L. Keller, Esq., Chief Deputy Prosecuting Attorney, Beckley, for Appellee.

Warren R. McGraw, II, Esq., Prosperity, for Appellant.

The Opinion of the Court was delivered PER CURIAM.

PER CURIAM.

This case is before the Court upon the appeal of the appellant, Alfred Gray. On August 29, 2003, following a four day trial, the appellant was convicted by a jury in the Circuit Court of Raleigh County of the felony offense of first degree murder with a recommendation of mercy. On December 5, 2003, the appellant was sentenced to life in prison. In this appeal, the appellant raises legal challenges with regard to prompt presentment, alleged juror misconduct, his rejection of a plea agreement, and objections surrounding numerous evidentiary issues. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, we are of the opinion that the circuit court did not commit reversible error and accordingly, affirm the decision below.

## I.

### FACTS

At 2:04 a.m., on October 31, 2002, the Raleigh County Emergency Operations Center ("EOC") received a 911 call from thirty-eight-year-old Alfred Gray, the appellant, wherein he stated, "I just shot my ole lady in the back of the head." When the EOC dispatcher asked if she was still breathing, the appellant replied, "No, she's dead." Thereafter, Deputy Darlington of the Raleigh County Sheriff's Office arrived at the home where the shooting occurred. He found the body of twenty-seven-year-old Stephanie Adkins (hereinafter, "the victim") in the muddy yard.

The Deputy found located inside a door of the home the .410 shotgun used to murder the victim. He then noticed the socks on the victim's feet were mud-soaked, while the tennis shoes found beside her body were clean. When Deputy Darlington asked the appellant why the victim was not wearing her shoes, the appellant said that "in the movies . . . when someone was shot, you . . . took their shoes off."

The appellant told Deputy Darlington he had loaded the gun and was going to show the victim how to shoot it and that as he was handing the gun to her it mysteriously discharged. The appellant theorized that the victim must have turned to see a passing vehicle at the same time the gun discharged resulting in the shotgun shell entering at the base of the neck in the back of the head, almost direct center. He also said he and the victim had planned to shoot cans off a fencepost from the porch of the house. Testimony during trial, however, indicated that no cans were found near the fencepost and it was too dark that night to even see the fencepost from the porch.

While still at the crime scene, the appellant told the officers he and the victim had a good relationship and they had not been arguing prior to the shooting and that she had been "sitting on [the appellant's] lap and [the two of them were] kissing." The appellant and the victim were the parents of a three-year-old child. He said the victim and their son were with him that night because he had planned to take his son squirrel hunting the next morning.

Soon after the shooting, Deputy Harold arrived and photographed the crime scene. He then asked the appellant if he would go to the sheriff's office with him and advised the appellant that he was not under arrest. He said the appellant did not appear intoxicated or impaired in any manner and voluntarily agreed to go with him to the sheriff's office. He also observed that the only other adult at the residence, besides the appellant and the victim, was Steve Williams, a friend of the appellant. Deputy Harold added that the three-year-old child of the appellant and victim was also present at the crime scene.

On the way to the sheriff's office, Deputy Harold dropped the child off at the child's grandmother's house. He said the child was "upset, crying, [and] wanting his mom," while the appellant was "taking a nap" in the back seat of the police car. During the time in the vehicle, the deputy did not interrogate the appellant. Upon arriving at the sheriff's of-

fice, Deputy Harold and Deputy Rakes discussed the situation and advised the appellant that he was under arrest for the murder of the victim. The appellant was then given *Miranda* warnings to which he executed a written waiver.

At trial, the evidence showed that during the days leading up to the shooting, the appellant and the victim had argued extensively with regard to the custody of their child. For example, on October 29, 2002, two days prior to the shooting, the victim received a recorded telephone message from the appellant stating, "Where you at, bit*h? Your fuc*ing kid's sick. Don't you care? Your fuc*ing son is ill. If you don't get here-you take care of him. What kind of mother are you?"

As of October 29, 2002, the victim had only exercised visitation rights with the child because she was under the mistaken belief that the appellant had legal custody of their son.[1] Later that evening, the victim spent the night with the child at the appellant's residence. At one point, while the victim and her mother were at the appellant's trailer discussing taking the child with them the following day, the appellant said, "I ought to just get my fuc*ing gun and kill you now." The appellant, however, allowed the victim to take the child with her when she left the next morning.

That morning, on October 30, 2002, the victim learned the appellant no longer had legal custody of the child and that she could regain custody. The appellant previously had temporary custody of the child, however, that order had expired leaving the custody of the child in question. Upon learning this information, the victim went to the courthouse and attempted to obtain a restraining order against the appellant and inquired about how she could regain custody of the child.

In spite of her expression of fear wherein she stated, "He's going to kill me[,]" in reaction to the issue of custody of the child, she was unsuccessful in obtaining a restraining order. Later that day, when the victim was speaking with the appellant on the telephone,

he "gave her forty-five minutes to get that baby back" to him. He then left a message on her answering machine saying, "Where's my kid at, you bit*h? You better get him back here."

The autopsy, performed by Dr. James Kaplan, the West Virginia Medical Examiner, found "fresh injuries" separate from the injuries surrounding the fatal gunshot wound. There was a "patterned injury" to the victim's right eye, a multiple fracture of her nasal bone, bilateral black eyes, bruising, and lacerations of her lips, "being the result of being punched or kicked in the lip and then having the tissue lacerate the lip." There were also abrasions on her cheek as well as abrasions around her neck "that [were] the result of an assault to that area" leading to the conclusion that "she had been beaten up" prior to being shot in the back of the head. The autopsy also led to the conclusion that the wound inflicted by the shotgun was at very close range.

On August 29, 2003, following a four day trial, the jury returned a verdict of guilty of first degree murder with mercy, by use of a firearm. On December 5, 2003, the appellant was sentenced to life in prison. This appeal followed.

## II.

### STANDARD OF REVIEW

In Syllabus Point 1 of *State v. Paynter*, 206 W.Va. 521, 526 S.E.2d 43 (1999), we held, " 'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)." We have further indicated that a circuit court's final order and ultimate disposition are reviewed under the abuse of discretion standard. *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997).

---

1. The appellant and victim were never married    to each other.

## III.

### DISCUSSION

#### A. Appellant's Statement and Prompt Presentment

The first issue presented by the appellant concerns a statement he made to the police prior to being taken to a magistrate. The appellant's counsel argues that following the appellant's arrest, an attorney, Mr. Wooton, informed the police by telephone that they were not to speak to the appellant. After receiving the telephone call, Deputy Rakes contacted Ms. Keller, an assistant prosecuting attorney in the Raleigh County Prosecuting Attorney's Office, and asked her for guidance. Ms. Keller told Deputy Rakes to instruct the appellant about Mr. Wooton's telephone call in order that the appellant could make an informed decision about how to proceed.

Specifically, the appellant argues that the State violated the prompt presentment rule in not taking him to a magistrate when the police had already made up their mind that he would be charged with murder. Accordingly, the appellant maintains that his statement should not have been admissible in the case against him. The appellant further states that it is settled law that when the primary purpose of the delay in taking a defendant to a magistrate is to obtain a statement that this tactic violates the prompt presentment rule.

According to the appellant, Deputy Rakes approached him and simply said, "Mr. Gray, John Wooton called, what do you want to do?" Then, the appellant states that Deputy Rakes proceeded to take a statement from him that was incriminating. The appellant argues that at the time of the statement he had been drinking heavily and was "in no shape to make an informed decision" and could not have made such a decision without knowing that Mr. Wooton was an attorney that had been contacted by someone in his family to represent him.

Initially, we must clarify that in spite of the appellant's assertions on appeal with re-

gard to the information provided by Deputy Rakes' surrounding Mr. Wooton's telephone call, the accurate transcription of the record provides that Deputy Rakes actually said, "I also told you that John Wooton had been retained by the family to represent you in this case. With all these rights in mind and knowing that Mr. Wooton had called up here, you still want to talk to us, is that correct?" [2] Thus, the appellant's version of events is not supported by the record in this case as he was clearly informed of who Mr. Wooton was and why he had called on his behalf.

In addition, as for the appellant's argument that he was in no shape to make an informed decision with regard to whether or not to waive counsel, we have found no evidence of record to conclude that the appellant was intoxicated or impaired in any manner prior to giving a statement to the police. In fact, the testimony of the police officers who spoke with the appellant the evening of the murder said that the appellant did not have slurred speech and did not appear in any way to be under the influence of alcohol or any controlled substances.

■ After thoroughly reviewing the record in this case, we find that there was no violation of the prompt presentment rule. Our prompt presentment rule is contained in West Virginia Code § 62–1–5(a)(1) (1997), and provides in relevant part: "An officer making an arrest under a warrant issued upon a complaint . . ., shall take the arrested person without unnecessary delay before a magistrate of the county where the arrest is made." Moreover, West Virginia Rule of Criminal Procedure Rule 5(a), provides that, "[a]n officer making an arrest under a warrant issued upon a complaint . . . shall take the arrested person without unnecessary delay before a magistrate within the county where the arrest is made."

■ In Syllabus Point 1 of *State v. Guthrie*, 173 W.Va. 290, 315 S.E.2d 397 (1984), we held that, " '[t]he delay in taking a defendant to a magistrate may be a critical factor [in the totality of circumstances making a confession involuntary and hence inad-

---

2. Mr. Wooton's involvement in this case is not clear from the record. While he may have made

an initial call on the appellant's behalf, he did not represent the appellant during trial.

missable] where it appears that the primary purpose of the delay was to obtain a confession from the defendant.' Syllabus Point 6, *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982)." We have further held that, "[w]hen a statement is obtained from an accused in violation of the prompt presentment rule, neither the statement nor matters learned directly from the statement may be introduced against the accused at trial." Syllabus Point 1, *State v. DeWeese*, 213 W.Va. 339, 582 S.E.2d 786 (2003). Nonetheless, as we wrote in footnote 10 of *DeWeese*, "[w]e wish to make clear that our prior cases do permit delay in bringing a suspect before a magistrate when the suspect wishes to make a statement." *See* Syllabus Point 3, *State v. Humphrey*, 177 W.Va. 264, 351 S.E.2d 613 (1986) ("The delay occasioned by reducing an oral confession to writing ordinarily does not count on the unreasonableness of the delay where a prompt presentment issue is involved.").

The record in the instant case is quite clear. Deputy Harold transported the appellant to the sheriff's office to discuss the circumstances of the victim's death. The appellant was not under arrest and voluntarily went with the deputy to the sheriff's office. The two of them arrived at the office at 5:41 a.m. Soon afterward, Deputy Harold and Deputy Rakes discussed the case and decided to arrest the appellant. Also occurring during this time period was the call from Mr. Wooton, which was followed by the telephone discussion with the assistant prosecuting attorney. Further time was spent advising the appellant about Mr. Wooton's call and then advising the appellant of his *Miranda* rights. Thus, the time period between 5:41 a.m., after which the appellant's status changed from non-custodial to custodial, and 6:16 a.m., when his recorded statement to the police began, was spent by Deputy Rakes on activities characterized in *State v. Wickline*, 184 W.Va. 12, 16, 399 S.E.2d 42, 46. (1990) as necessary delay. This Court in *Wickline* provided examples of necessary delay as follows:

1) to carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; 2) to determine whether a charging document should be issued accusing the arrestee of a crime; 3) to verify the commission of the crimes specified in the charging document; 4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; 5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may have been associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime.

(Footnote omitted; citations omitted). *Id.*

The record provides no evidence of "unnecessary delay" during this time period of less than thirty-five minutes between the defendant's attaining custodial status and the interrogation. What the record does show is that when told John Wooton had been retained as his lawyer, the appellant told the officers he did not know Mr. Wooton and had never retained him, but he did know he could stop talking to detectives at any time and could demand a lawyer. In fact, the appellant demonstrated his ability to assert his right to counsel when he realized his claim of accidental shooting was not convincing the deputies as demonstrated by the following exchange during the appellant's statement:

Deputy Harold: Anybody that was walking around down there, all I did was walk around and I've got mud upon my pants. But there's no mud on her shoes, they're clean-actually, they're dry, even the soles of her shoes was dry.

Appellant: I believe ya'll is fu*k'n trying to turn this shit into something.

. . . .

I want to talk to my lawyer.

Deputy Rakes: Okay.

Appellant: This was a fu*k'n accident, I cared about the girl and ya'll are not going to put it off like I hurt her on purpose, it's not going to happen—it's not going to fu*k'n happen.

Deputy Rakes: All right. . . . [the appellant] has evoked his rights, he wants to talk to his lawyer. We're going to end the statement now.

The record in this case demonstrates that the appellant voluntarily gave a statement to the police after he was advised of his *Miranda* rights. This also occurred after he was advised that a lawyer had been retained and did not want him to speak with the police about the victim's death. The statement in question was also substantially the same statement he had given to deputies at the murder scene. It appears that he simply believed he could convince the investigating officers that the shooting was accidental. The appellant's statement was voluntary and not in violation of the prompt presentment rule.

## B. Juror Misconduct

The appellant next argues that during the trial testimony of Deputy Rakes, his defense counsel observed two jurors reading books and promptly moved for a mistrial which was denied. Instead of granting the mistrial, the appellant says that the circuit judge simply instructed the jurors to "put your reading material away." The appellant contends that he was deprived of his constitutional right to a fair trial because those jurors were physically present, but not mentally present and therefore unfit for jury duty. The appellant states that "a juror off in the literary world created by some author is just as absent, and just as unfit for duty, as juror who is asleep or a juror who is physically absent from the courtroom ."

The State calls the appellant's claim of juror misconduct an invention without any basis in the record of the trial, and therefore it does not constitute grounds for appeal. We agree. Upon reviewing the record, we found the one occasion when the appellant addressed this issue with the circuit court during the trial. It occurred during the cross-examination of one of the appellant's witnesses at trial, after the witness could not recall a previous statement he had told Deputy Rakes prior to the trial.

As the State was beginning to refresh the witness' recollection by playing the tape-recording of his prior statement, the jury was sent to the jury room by the circuit judge in order that the witness could hear the recording out of the presence of the jury. After the jury had been excused, the appellant's

counsel moved that the jurors be present for the playing of the recording. The circuit judge said that it wasn't necessary for the jury to be present; however, he allowed the jury to return to the courtroom during the playing of the tape-recording. When · the recording began playing, the appellant's counsel objected and the tape was stopped. The following then occurred:

MR. McGRAW: Your Honor, I'm fear about— I've observed two jurors who are reading books, and, based upon that, I would move for a mistrial of this matter. The jurors are in the back row—

THE COURT: Well, I told them—I told them that we're playing it for the benefit of the— of the witness, and you told me that you wanted them in here.

MR. McGRAW: I just observed as the tape started, a couple of them were reading.

THE COURT: Okay, all right.

MR. McGRAW: I didn't want—

THE COURT: Okay. All right, ladies and gentlemen, you need to put your—your reading material away because, even though this is being played for the benefit of the witness in your presence, you still need to listen.

■ It is clear from the record that the tape-recording of the witness' statement was being played· for the sole purpose of refreshing the witness' recollection. Moreover, the circuit judge had allowed jurors to read personal materials during breaks of court. In fact, prior to trial the circuit judge said, "Bring a book or a magazine if you like. You will have some down time during this process, and that's okay." We find nothing wrong with the practice of allowing jurors to read during breaks in court and believe it is a common occurrence during many trials.

In this instance, it is clear to us that confusion . surrounded the playing of the tape-recorded statement and that the jurors believed the recording was for the single purpose of assisting the witness with his recollection, thereby resulting in a break in the proceeding as far as their part in the trial. Regardless of whether or not such an impression was accurate, the appellant's

counsel immediately objected and the alleged error was cured. There was not another instance from the face of the record wherein this became an issue during the trial. The appellant also argued this issue during his December 5, 2003, sentencing hearing. At that time, the State correctly responded that the only time jurors had books was during breaks, when the circuit judge permitted them to read. Nonetheless, the circuit court granted the appellant leave to "develop the evidence" of juror misconduct and permitted him to interview jurors concerning this claim. Following the appellant's investigation, he was unable to produce any evidence of juror misconduct.

■ We have firmly held that, "'[t]he right to a trial by an impartial, objective jury in a criminal case is a fundamental right guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article III, Section 14 of the West Virginia Constitution.' Syllabus point 4, [in part,] State v. Peacher, 167 W.Va. 540, 280 S.E.2d 559 (1981)." Syllabus Point 4, in part, State v. Derr, 192 W.Va. 165, 451 S.E.2d 731 (1994).

■ Moreover, as we held in Syllabus Point 2 of WV Dept. of Health & Human Resources Employees Federal Credit Union v. Tennant, 215 W.Va. 387, 599 S.E.2d 810 (2004), "'An appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being in favor of the correctness of the judgment.' Syllabus Point 5, Morgan v. Price, 151 W.Va.

158, 150 S.E.2d 897 (1966)." The facts of this case simply do not amount to juror misconduct.

## C.  Character of the Victim.

■ The appellant's entire argument on this issue consists of the following paragraph:

> After the testimony of the state's witness that the victim was of good character "a twinkle in her eyes[.]" The defendant was still denied the ability to introduce evidence of the victim's true personality, which was bad. Thus, denying the defendant the right to a fair trial.

This argument amounts to nothing more than conclusory statements without any citation or authority and is therefore insufficient for appellate review. The defendant refers only to the phrase "twinkle in her eyes" as an apparent claim that evidence of the victim's good character was introduced.

■ We believe that the circuit court correctly found that the evidence of the victim's character had no relevance to the appellant's defense of accidental shooting. Given the facts of this case, the issue is easily disposed of in light of the interaction between Rules 404(a)(2) [3] and 405 [4] as well as the law of self-defense. It is well-settled that where a defendant relies on self-defense in a homicide, a malicious wounding, or an assault prosecution, the defendant may introduce evidence concerning violent or turbulent character of the victim, including prior threats or attacks on defendant and to show that the victim was the aggressor. See Syllabus Point 3, State v. Richards, 190 W.Va. 299, 438 S.E.2d 331 (1993).

---

**3.** Rule 404(a) states in pertinent part:

(a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except:

....

(2) Character of the victim of a Crime Other than a Sexual Conduct Crime. Evidence of a pertinent trait of character of the victim of the crime, other than a crime consisting of sexual misconduct, offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case

to rebut evidence that the victim was the first aggressor; ....

**4.** Rule 405 states:

(a) Reputation or opinion.-In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) Specific Instances of Conduct. -In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Considering the facts of this case; however, the evidence concerning the victim's general reputation was not relevant as admissible evidence. The appellant did not assert self-defense or allude to any possibility that the victim was aggressive in any manner. Instead, he claimed that the shooting was accidental. He even said he and the victim had a good relationship and that just prior to the shooting, the victim was sitting on his lap and the two of them were kissing. Likewise, the appellant has not cited any legal authority for the admissibility of evidence concerning the "bad personality" of the victim in a murder case when his defense was that this was an accidental shooting. In *State, Dept. Of Health v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995), we stated that "[a] skeletal 'argument', really nothing more than an assertion, does not preserve a claim.... Judges are not like pigs, hunting for truffles buried in briefs." (Citation omitted).

We find no evidence wherein the circuit court engaged in any conduct that would be remotely indicative of an abuse of discretion by the circuit court. This Court has previously adhered to the rule that, "[al-though we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *State v. LaRock*, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996). *Accord State v. Allen*, 208 W.Va. 144, 162, 539 S.E.2d 87, 105 (1999); *State v. Easton*, 203 W.Va. 631, 642 n. 19, 510 S.E.2d 465, 476 n. 19 (1998); *State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995). Based upon all of the above, we believe that there is no merit to this claim of error.

### D. Deputy Rakes' Testimony

The appellant next asserts error with regard to Deputy Rakes' testimony. According to the appellant, Deputy Rakes was instructed not to discuss the prior domestic violence matters, however, during cross-examination, he stated, "the prior acts of violence and documented threats that the [appellant] made towards [the victim]. I think

that, in itself, is overwhelming evidence as to his intent and what he had planned to do." The appellant maintains that the circuit court should have declared a mistrial or allowed the appellant to ask questions regarding domestic violence of the victim.

After reviewing the record, we find that the testimony by Deputy Rakes was not error. The appellant fails to mention the fact that on August 19, 2003, the State filed a Notice of Intent to use Prior Relationship Evidence, "including prior ... threats by the defendant and acts of domestic violence." The State then voluntarily agreed not to elicit such evidence except as to acts committed in the days immediately preceding the murder, which acts were evidence of *res gestae* and the defendant's state of mind at the time of the killing. In *State v. Duell*, 175 W.Va. 233, 241, 332 S.E.2d 246, 254 (1985), we held that:

> Whether evidence offered is too remote to be admissible upon the trial of a case is for the trial court to decide in the exercise of sound discretion; and its action in excluding or admitting the evidence will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.

Moreover, there must also be some clear link between the threat made and the ultimate victim. For example, in *Duell*, we held that direct threats against specific persons were enough to overcome concerns about remoteness. This type of evidence of threats is usually used to prove premeditation.

In this case, the testimony of Deputy Rakes was not evidence of improperly admitted prior bad acts committed by the appellant. This sole mention of the appellant's violence was elicited by the defense on cross-examination following the appellant's counsel's specific question as to the basis upon which Deputy Rakes concluded this was a case of murder. Deputy Rakes cited several reasons for such a conclusion including "the prior acts of violence and documented threats that the [appellant] made toward [the victim]." Deputy Rakes specifically referred to the victim's muddy stocking feet, which "indicated that she had been fleeing ... to avoid

the perpetrator [and] that she already had been beaten or she knew what was about to come." Deputy Rakes was simply answering the question asked by the appellant's counsel with regard to the investigation of the victim's murder.

Moreover, the appellant's counsel did not object to Deputy Rakes' response nor did he object to any of the other facts mentioned as the basis of his conclusion. It was only after the circuit judge called counsel to the bench and said to the appellant's counsel, "you've asked him a wide open question. You're letting him go[?]" that the appellant's counsel moved for a mistrial based upon testimony of prior domestic violence acts. The circuit court denied the motion finding that the appellant's counsel invited the error. *See* Syllabus Point 2, *State v. Bowman*, 155 W.Va. 562, 184 S.E.2d 314 (1971) ("An appellant or plaintiff in error will not be permitted to complain of error in the admission of evidence which he offered or elicited, and this is true even of a defendant in a criminal case."); Syllabus Point 4, *State v. Johnson*, 197 W.Va. 575, 476 S.E.2d 522 (1996) (" 'A judgment will not be reversed for any error in the record introduced by or invited by the party seeking reversal.' Syl. pt. 21, *State v. Riley*, 151 W.Va. 364, 151 S.E.2d 308 (1966)."); *State v. Bennett*, 183 W.Va. 570, 396 S.E.2d 751 (1990).

Given the specific facts of this case, the testimony of Deputy Rakes demonstrates it was unnecessary for the circuit court to find that his statement was invited error elicited by the appellant's counsel's questioning. Deputy Rakes was specifically testifying as to the facts surrounding the days leading up to the murder of the victim. He was explaining the circumstances of the crime scene and referring to evidence of the appellant's tape-recorded threats that were already admitted into evidence. He was also discussing the appellant's statements made both at the crime scene and while at the sheriff's office. This was not evidence of irrelevant bad acts that occurred months or years in the past brought out to taint the image of the appellant. It was simply a police officer discussing the previously admitted evidence in light of his investigation of the victim's murder. Thus, the single sentence referring to the appellant's well-documented and tape-recorded threats surrounding the victim's brutal murder did not rise to a level of trial error.

### E. The Gun Evidence

The appellant maintains that the State should not have been allowed to use the gun or any evidence derived from the gun because it violated Rule 16 of the West Virginia Rules of Criminal Procedure[5] by not timely having the gun examined and then turning over the results of the examination. The appellant states that he was informed on August 22, 2004, that the gun in question "was still not available for the defense to examine" even though the trial was scheduled to begin August 26, 2004. The appellant further states that on the day prior to his trial, the State picked an expert who was unknown by the defense team and made arrangements to have the gun examined by this expert.

Upon reviewing the record, however, it is clear that during the months leading up to the trial, the appellant did not file a motion to have the shotgun examined and made no such request for examination until the prosecutor notified the appellant a week prior to trial that the Criminal Identification Bureau (C.I.B.) would be submitting a report concerning the fact that the gun was in proper working condition. The circuit court correctly found during trial that:

> Mr. McGraw, you had every-you knew of the existence of the gun. You knew ... your client's position that he handed it to ... the victim and it went off. You could have made a motion to have the gun in-

**5.** Rule 16 of the West Virginia Rules of Criminal Procedure, in part, provides:

(D) Reports of Examinations and Tests. Upon request of the defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the state, and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

spected yourself. You didn't do that, and you can't sit back on your thumbs ... and then complain later on when it is inspected and there's nothing found wrong with it.

■ At the outset, we note that the appellant undertakes a significant burden in showing error in this regard as:

"The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus point 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds, State ex rel. R.L. v. Bedell*, 192 W.Va. 435, 452 S.E.2d 893 (1994).

Syllabus Point 1, *State v. Calloway*, 207 W.Va. 43, 528 S.E.2d 490 (1999). Moreover, in *State ex rel. Rusen v. Hill*, 193 W.Va. 133, 139, 454 S.E.2d 427, 433 (1994), we stated:

While discovery has not been elevated to a constitutional dimension, it is clear that constitutional rights of a criminal defendant are implicated when a discovery system has been put in place and the prosecution fails to comply with court ordered discovery. We believe that it is necessary in most criminal cases for the State to share its information with the defendant if a fair trial is to result. Furthermore, we find that complete and reasonable discovery is normally in the best interest of the public.

We also said:

The purpose of Rule 16(a) [of the West Virginia Rules of Criminal Procedure], our basic discovery rule in criminal cases, is to protect a defendant's right to a fair trial. The degree to which that right suffers as a result of a discovery violation cannot be determined by simply asking would the nondisclosed information enhance or destroy the State's case. A significant inquiry is how would the timely access of that information have affected the success of the defendant's case.

193 W.Va. at 139, 454 S.E.2d at 433. Finally, in *Rusen*, we indicated that whether prejudice results from the failure of the State to. comply with a discovery order is determined by asking whether the non-disclosure results in a surprise and whether it, hampers the preparation and presentation of the defendant's case. *Id.*

■ Upon a review of the entire record we find no evidence of error. We further conclude that the appellant's expert was an independent expert who was not "picked by the State." Deputy Rakes, who was in possession of the weapon, simply contacted the appellant's investigator solely for the purpose of allowing the investigator ·to take possession of the shotgun to allow for whatever testing of the gun the defense deemed necessary. Moreover, the record demonstrates nothing other than the fact that the defense investigator was assigned by the appellant's counsel. In fact, this argument was not even raised until the appellant's sentencing hearing. Prior to that, the appellant referred to the gunsmith as a defense expert and as the appellant's "independent expert."

The State maintains that the "arrangements" being made by the State with the expert were only for the appellant's expert to get access to the firearm. We see no evidence of record to the contrary. Equally important, however, is the fact that the circuit judge offered the appellant a continuance for as much time as he needed to prepare a response to the C.I.B. report. The appellant denied the judge's offer. There was no error with the introduction of the gun or the C.I.B. report.

## F. The Guilty Plea

Finally, the appellant argues that he should have been allowed to accept a plea to second degree murder. Prior to his trial, the State made such an offer to the appellant and gave him until the Friday before his trial to accept. The appellant considered the offer, but refused it. Then, once his trial began and a significant amount of testimony damaging to his case was presented, he changed his mind and wanted to accept the expired offer to plead to second degree murder; however, the State refused to allow him to do so. The appellant believes that in spite of the fact that the plea offer clearly had expired, he should have been allowed to make the plea anyway.

We have recognized that "[a]s a matter of criminal jurisprudence, a plea agreement is subject to principles of contract law insofar as its application insures a defendant receives that to which he is reasonably entitled." *State ex rel. Brewer v. Starcher*, 195 W.Va. 185, 192, 465 S.E.2d 185, 192 (1995). Such agreements require "ordinary contract principles to be supplemented with a concern that the bargaining and execution process does not violate the defendant's right to fundamental fairness[.]" *State v. Myers*, 204 W.Va. 449, 458, 513 S.E.2d 676, 685 (1998).

We also made clear in Syllabus Point 4 of *Myers*, in part, that "[w]hen a defendant enters into a valid plea agreement with the State . . ., an enforceable 'right' inures to both the State and the defendant not to have the terms of the plea agreement breached by either party." *See also State ex rel. Gray v. McClure*, 161 W.Va. 488, 492, 242 S.E.2d 704, 707 (1978) ("The rule we follow . . . is that a prosecuting attorney . . . is bound to the terms of a plea agreement once the defendant enters a plea of guilty or otherwise acts to his substantial detriment in reliance thereon.").

In this case, however, there was no agreement between the parties. It is clear from the record, and, by the appellant's own admission, that he rejected the State's plea offer with the understanding that it expired on the Friday prior to his trial.

## IV.

### CONCLUSION

Accordingly, for the reasons stated above, we affirm the appellant's conviction.

Affirmed.