708 S.E.2d 322

**STATE of West Virginia, Appellee,**

v.

**Steven L. MAHOOD, Appellant.**

No. 35463.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 15, 2010.

Decided Oct. 14, 2010.

Lee F. Benford, II, Esquire, Morgan B. Hayes, Esquire, Ripley, WV, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, WV, for Appellee.

PER CURIAM:

Steven L. Mahood (hereinafter "Mr. Mahood") appeals from an April 14, 2009, amended sentencing order of the Circuit Court of Jackson County sentencing him to life without mercy upon being convicted of the first degree murder of his wife, Ramona Mahood, pursuant to *W.Va.Code*, § 61–2–1. The sole ground we consider on appeal is Mr. Mahood's claim that he was denied a fair trial because the jury heard inadmissible evidence about an adulterous affair he had with a State witness. This affair was revealed during the State's direct examination of this witness, Lisa Whitehouse. Mr. Mahood claims that this statement concerning his marital infidelity biased the jury against him and led to his conviction. The State argues that Mr. Mahood was convicted not because of one remark about a sexual relationship, but rather because it presented overwhelming evidence of his guilt throughout the course of the four-day trial.

For the reasons stated below, we affirm the judgment of conviction and sentencing order.

## I.

### Facts & Background

At approximately 7:00 a.m. on August 7, 2007, Jackson County 911 received a telephone call from Mr. Mahood's sister-in-law[1] requesting that emergency service responders be sent to Mr. Mahood's residence because his wife, Ramona Mahood, was dead.

---

1. The testimony at trial revealed that Mr. Mahood called his brother, Jerry Mahood, between 5:15 a.m. and 5:30 a.m. on August 7, 2007, stating that he thought his wife was dead and asking him to come to his residence. Jerry Mahood testified that when he arrived at the residence, sometime after 6:00 a.m., Ramona was dead, lying face up on the couch and that his brother, the defendant, was crying and kneeling down next to her. Ramona was not covered up with a quilt when Jerry Mahood entered the residence, as she later was when the EMT workers and police arrived. Jerry Mahood did not state, nor was he asked, whether Ramona was clothed or naked when he arrived. Jerry Mahood spent approximately one hour at the residence before calling his wife and asking her to call 911. Neither Mr. Mahood, nor his brother, offered any explanation as to why they did not immediately call 911.

Two Jackson County EMT workers were dispatched to the Mahood residence, along with a Jackson County Deputy Sheriff. Upon entering the residence, the EMT workers found Ramona Mahood lying on the living room couch, covered up with a quilt. They determined that Ramona Mahood had no pulse, that slight rigor mortis had already set in, and that there were signs of severe bruising on the decedent's face, chin, nose and arm.

Deputy Herbert Faber arrived at the Mahood residence at approximately 7:54 a.m. After obtaining permission from Mr. Mahood, Deputy Faber conducted a search of the premises and found blood droplets throughout the residence, including on the refrigerator, the kitchen wall, a bread machine on the kitchen counter, the stove, dishes next to the sink, the kitchen table, and on the floor in the bedroom. Deputy Anthony Boggs, who arrived on the scene at 8:16 a.m., observed blood droplets in several locations in the residence. He also noticed a pile of wet clothes in the bedroom floor, which included a pair of jean shorts, a blue t-shirt, a pair of woman's panties and a bra.

West Virginia State Police Sergeant S.E. Wolfe arrived on the scene around 8:20 a.m., and inspected a green four-door Ford vehicle that was parked outside the residence. He testified that there was blood and hair all over the vehicle, including on the hood, roof, windshield, and the rear passenger side. Sergeant Wolfe stated that:

> A lot of the hair was pulled hair, and when I say "pulled hair," you could see that it was still connected to skin follicles. So when you pull hair out a lot of times it is still connected to the skin here. We saw a lot of hair like that.

Mr. Mahood agreed to be interviewed by Deputy Faber, and the interview commenced at 9:27 a.m. Mr. Mahood was asked about his activities the previous day and stated that he fell asleep in his living room chair after he and Ramona cooked out, and that Ramona must have left the house at some point during the evening while he was asleep. Mr.

Mahood said that Ramona woke him up when she returned to the house, though he did not know what time she returned. He said Ramona was "all beat to hell" when she came home, and though he asked her if she wanted to go to the hospital, "[s]he said, no she's fine." Mr. Mahood stated that he asked her what had happened to her, "but I couldn't get nothing out of her." He said that he got a rag and started wiping her hands and face and tried to talk her into going to the emergency room, but she refused to go.

Mr. Mahood agreed to another interview which began at 6:02 p.m. on the same date, August 7, 2007. In this interview, Mr. Mahood stated that he did not leave his residence at all the previous day and that he "weed-eated the biggest part of the day and we had a little cookout" between 2:00 and 3:00 p.m. After the cookout, he continued weed-eating until "it was just about dark." He then went inside and fell asleep in a living room chair. When he fell asleep, Ramona was on the couch watching television. Mr. Mahood said that he remained asleep in the chair until Ramona woke him upon returning home from being out. She "looked like she'd had the tar beat out of her." During this interview, Mr. Mahood said that Ramona came into the house, laid down on the living room couch, and would not verbally respond to his questions about how she had been injured or whether she wanted to go to the hospital.[2] After wiping her face off with a washcloth, Mr. Mahood stated that he "sat back in the chair and smoked me a cigarette and I watched her for a little bit. The next you know I was out." When Mr. Mahood woke up again, between 4:00 and 5:00 a.m., he found that Ramona was lying on the couch and had apparently died.

In the subsequent investigation, the police discovered a number of inconsistencies with Mr. Mahood's statements. Tim Tucker lived five miles away from Mr. Mahood and stated that Mr. Mahood came to his house at about 7:00 p.m. on August 6, 2007. Mr. Tucker testified that the two of them drank two beers each and "weed-eated" at Mr. Tucker's

---

**2.** During the 9:27 a.m. interview, Mr. Mahood stated that when he asked Ramona if he could take her to the hospital, she responded verbally,

"Baby, I'll be all right. Just let me lay back here."

residence from 7:00 to 9:00 p.m. At 9:00 p.m., Mr. Tucker's stepdaughter, Lisa Whitehouse, called and asked Mr. Tucker to come to her residence. Mr. Tucker states that Mr. Mahood then called Ramona and asked her to drive Mr. Tucker to his stepdaughter's residence. Ramona agreed and drove Mr. Tucker and Mr. Mahood to the stepdaughter's house, where they arrived around 10:00 p.m. and stayed for approximately thirty minutes. After leaving her house, Mr. Tucker, Mr. Mahood and Ramona Mahood went to a bar where they stayed for fifteen to twenty minutes. After leaving the bar, the three of them returned to Mr. Tucker's house, where they remained until approximately 12:00 a.m., at which time Mr. Mahood and Ramona left in their green four-door Ford.

Lisa Whitehouse's testimony confirmed Mr. Tucker's sequence of events. She stated that Mr. Tucker, Mr. Mahood and Ramona Mahood arrived at her residence at about 9:50 p.m. on August 6, 2007, and left at about 10:30 p.m. This testimony from both Mr. Tucker and Ms. Whitehouse directly conflicts with Mr. Mahood's statement that he did not leave his residence at all on August 6, 2007, and that after weed-eating, he came inside and fell asleep in his living room chair around 9:00 p.m.

A Jackson County grand jury returned an indictment against Mr. Mahood, charging him with murdering Ramona Mahood in violation of *W.Va.Code*, § 61–2–1.[3] A four-day jury trial began on October 14, 2008. The State called fifteen witnesses and introduced 122 exhibits during the trial. The State presented testimony from expert witnesses stating that Ramona's blood and hair were found on the car and throughout the residence. The State introduced the two statements Mr. Mahood made to the police on August 7, 2007. The State called Tim Tucker and Lisa Whitehouse who testified that they spent

time with Mr. Mahood on August 6, 2007, contradicting his statement that he never left his residence that evening. Dr. James Kaplan, the chief medical examiner, also testified on behalf of the State. Dr. Kaplan examined Ramona Mahood and determined that she died from:

> [M]ultiple powerful blows to her head and face and torso as well as manual strangulation. That is to say, the assailant took his or her hands, placed them around Ms. Mahood's neck, and squeezed until Ms. Mahood had died. There was also evidence of injury to her genitals and to the area around her anus, which suggested something had been inserted into her anus during life in a forcible fashion.

The medical examiner's conclusion that Ramona Mahood died from manual strangulation is inconsistent with Mr. Mahood's statement that she died from her injuries while lying on the couch. Dr. Kaplan also testified that the brain injury Ramona suffered would have affected her immediately, and that she would not have been able to drive a car, walk or talk after suffering such an injury. This conclusion conflicted with Mr. Mahood's statement that Ramona suffered the injuries somewhere outside the residence, drove home and died at some point after returning to the residence.

Mr. Mahood did not testify during the trial. The defense called four witnesses, all of whom were asked about the frequency with which Mr. Mahood consumed alcohol. While these witnesses testified that Mr. Mahood was a regular drinker, there was no testimony that he was intoxicated on August 6, 2007. In his statement to the police, Mr. Mahood stated that he was not drunk on August 6, 2007. Lisa Whitehouse testified that Mr. Mahood did not appear to be intoxicated on August 6, 2007.

---

**3.** *W.Va.Code*, § 61–2–1 states:

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnaping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [60A–4–401 et seq.], chapter sixty-a of this

code, is murder of the first degree. All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

The jury found Mr. Mahood guilty of first degree murder without a recommendation for mercy. By order entered on April 14, 2009, the Circuit Court of Jackson County sentenced him to life without mercy. Mr. Mahood appeals from this sentencing order.

## II.

### Standard of Review

On appeal, Mr. Mahood argues that the circuit court erred when it refused to grant a mistrial following the State's introduction of bad character evidence through its questioning of a State witness who revealed that she had an adulterous affair with him. In *State v. Lowery*, 222 W.Va. 284, 664 S.E.2d 169 (2008), this Court stated that "[t]he decision to grant or deny a motion for mistrial is reviewed under an abuse of discretion standard." 222 W.Va. at 288, 664 S.E.2d at 173. In *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983), this Court explained that:

> The decision to declare a mistrial, discharge the jury and order a new trial in a criminal case is a matter within the sound discretion of the trial court. A trial court is empowered to exercise this discretion only when there is a "manifest necessity" for discharging the jury before it has rendered its verdict. This power of the trial court must be exercised wisely; absent the existence of manifest necessity, a trial court's discharge of the jury without rendering a verdict has the effect of an acquittal of the accused and gives rise to a plea of double jeopardy.

172 W.Va. at 304, 305 S.E.2d at 260 (citations omitted). With these standards in mind, we consider the arguments presented by the parties.

## III.

### Discussion

■ Mr. Mahood argues that he is entitled to a new trial because the jury heard improper bad character testimony about a sexual relationship he had with Lisa Whitehouse.[4] This evidence was introduced during the State's direct examination of Ms. Whitehouse when the following exchange took place:

Q. Okay. What type of relationship did you have with Mr. Mahood?

A. Just friends.

Q. Did you ever have any other type of relationship with him?

A. Yes.

Q. What type of relationship was that?

A. Sexual relationship.

Following this answer, defense counsel objected and the parties discussed the objection at the bench.[5] After a brief discussion, de-

---

**4.** While Mr. Mahood's brief fails to cite the rule, the complained of bad character evidence presumably violated Rule 404(b) of the *West Virginia Rules of Evidence*, which provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**5.** The following exchange took place during the discussion at the bench:

> Court: How is it admissible?
> State: I think it is admissible because the night—the night that she died—the night before she died, they were all—they were at Lisa

[Whitehouse] Harrison's house. And their relationship could have been broken off but—
Court: Whose relationship?
State: Lisa and Steve's. But he called her "Ol' Blue Eyes." And I just think it is relevant in terms of—I mean, obviously, she was killed the very—that evening or the next.
Court: What does that have to do with whether she was having a sexual relationship with the defendant?
State: Well, the fact that he called her "Ol' Blue Eyes," that—I think that was a little bit of history there, with Mona asking her why she kept calling her that. I think that maybe that may have been what started the fight—
Court: I assumed it was being offered as evidence of motive in some way.
State: I think it is, yeah.
Court: How is it relevant or probative to motive?
State: Well, within a couple of hours after leaving their house, the victim was killed. And they weren't just having a sexual relationship then, but—I just think that it may have come up afterwards, and that is why they got into a fight.

fense counsel moved for a mistrial. The trial court ruled that Ms. Whitehouse's comment about having a sexual relationship with Mr. Mahood was inadmissible evidence and instructed the jury to disregard her statement. The trial court then gave the jury the following curative instruction:

Ladies and gentlemen of the jury, the testimony of this witness with respect to the nature and extent of her relationship with the defendant, Steven L. Mahood, that you just heard is not admissible as evidence, and you are to disregard it entirely, give it no mind, and you are directed to—to completely ignore what in connection with your determination of whether the evidence that is presented in this trial is sufficient to prove guilt beyond a reasonable doubt.

Do you understand what I'm saying? *It is not admissible, it is not relevant, and therefore the jury is to disregard it.*

(Emphasis added).

Mr. Mahood argues that, despite the fact that the trial court sustained his objection and gave the jury a curative instruction to disregard it, the prejudice he suffered from this comment was so severe that the trial court should have granted his motion for a mistrial. We disagree.

In *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966), this Court dealt with an analogous factual scenario to that in the case *sub judice*. Bonnie June Hamric was charged with the first degree murder of Glenn E. Winters. The State,

[I]n an apparent effort to establish a motive for the shooting, asked the deceased's former wife if she had a conversation with the defendant concerning her sexual rela-

tionship with the deceased, which was immediately objected to by counsel for the defendant.

*Hamric*, 151 W.Va. at 11–12, 151 S.E.2d at 260.

█ Following this objection, defense counsel moved for a mistrial. The trial court denied the motion for a mistrial because it determined that the appropriate remedy was to sustain the objection and instruct the jury not to consider the State's question. We reviewed the trial court's ruling and held at Syllabus Point 18 of *Hamric* that:

Ordinarily where objections to questions or evidence by a party are sustained by the trial court during the trial and the jury instructed not to consider such matter, it will not constitute reversible error.

We relied on *Hamric* in *State v. Gwinn*, 169 W.Va. 456, 288 S.E.2d 533 (1982), a case in which a witness gave an unresponsive statement during his testimony that was prejudicial to the defendant. As in *Hamric* and the case *sub judice*, defense counsel immediately objected to the witness's statement. The trial court sustained the objection and instructed the jury to disregard the testimony. We recognized in *Gwinn* that "[t]here are extraordinary situations where the objectionable evidence is so prejudicial that an instruction to the jury to disregard it is ineffective, and a mistrial is an appropriate remedy." 169 W.Va. at 471, 288 S.E.2d at 542. We concluded, however, "that the objectional statement in this case does not rise to that level. The prompt action of the trial court, which twice instructed the jury to disregard the statement, precluded any prejudicial error." *Id.*[6]

Court: Well, yeah, but we deal with evidence.
State: Well, I don't have anything specifically linking it, except for the blue eyes comment and the fact that I think Mona had asked her why.
Court: Yeah, but if it is probative of motive, you would have to have some evidentiary basis for concluding that the reason the victim was killed had to do with Lisa.
State: Well, I mean, I don't know that … I don't know what happened when they got home.
Court: Okay. All right. What is your motion?
Defense Counsel: Well your Honor, it is improper … move for a mistrial, your honor.

Court: All right. Well, I don't—I think that is—the Court is going to instruct the jury to disregard it and—in today's times, I don't see that as amounting to such prejudice that it can't be overcome by a limiting instruction. So I'm not going to grant your motion for mistrial.

6. Other cases in which we have relied on Syllabus Point 18 of *Hamric* include *State v. Lusk*, 177 W.Va. 517, 354 S.E.2d 613 (1987); *State v. Bennett*, 183 W.Va. 570, 396 S.E.2d 751 (1990); *State v. Catlett*, 207 W.Va. 747, 536 S.E.2d 728 (2000); *Hicks v. Ghaphery*, 212 W.Va. 327, 571

In the present case, we do not find that Ms. Whitehouse's testimony concerning her sexual relationship with Mr. Mahood was so prejudicial that the trial court should have granted a mistrial. The sexual relationship was only mentioned one time. Defense counsel immediately objected after this comment was made, the trial judge sustained the objection and gave the jury a thorough curative instruction to disregard this testimony. *See Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." (Citations and quotations omitted)).

We do not find that the single mention of an adulterous affair with Ms. Whitehouse was "devastating to the defendant" in this case. *Greer, supra.* As set forth in detail above, the overall quality of the State's proof of Mr. Mahood's guilt was overwhelming. Viewing the totality of the evidence, the testimony concerning Mr. Mahood's adulterous affair with Ms. Whitehouse was not so extraordinary and prejudicial that an instruction to the jury to disregard it was ineffective. We therefore conclude that the trial court did not err when it denied Mr. Mahood's motion for a mistrial.

## IV.

### Conclusion

Based on the foregoing, the judgment of the Circuit Court of Jackson County is hereby affirmed.

Affirmed.

Justice McHUGH, deeming himself disqualified, did not participate in the Decision.

Judge TUCKER, sitting by temporary assignment.

S.E.2d 317 (2002); and *State v. White*, 223 W.Va.  527, 678 S.E.2d 33 (2009).