# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Steven Mahood,**
**Petitioner Below, Petitioner**

**vs)  No. 14-0026** (Fayette County 12-C-330)

**David Ballard, Warden,**
**Respondent Below, Respondent**

**FILED**

March 16, 2015
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

## MEMORANDUM DECISION

Petitioner Steven Mahood, by counsel D. Adrian Hoosier II, appeals the Circuit Court of Jackson County's November 20, 2013, order that denied his petition for writ of habeas corpus. Respondent David Ballard, Warden, by counsel Christopher Dodrill, filed a response. Petitioner filed a "Supplemental Petitioner's Brief and Reply to Respondent's Response."[1] On appeal, petitioner argues that the circuit court erred in denying his motion for default judgment and his petition for writ of habeas corpus because he received ineffective assistance of counsel.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In April of 2009, a Jackson County Grand Jury indicted petitioner on the charge of the first degree murder of his wife. Following a four-day trial, the jury convicted petitioner of first degree murder. Thereafter, the circuit court sentenced petitioner to life in prison without mercy.

In August of 2009, petitioner filed a direct appeal with this Court arguing that he was denied a fair trial because the circuit court admitted inadmissible evidence about an adulterous

---

[1]Petitioner filed a "Combined Motion for Leave to Clarify Claims and Petitioner's Second Supplemental Brief and Reply to Respondent's Response." Respondent filed a "Response in Opposition to Petitioner's Combined Motion for Leave to Clarify Claims and Petitioner's Second Supplemental Brief and Reply." This Court refused petitioner's "Combined Motion for Leave" by order entered December 15, 2014. Subsequently, petitioner also filed a "Supplemental Petitioner's Brief and Reply to Respondent's Response." By order entered January 15, 2015, this Court on its own motion struck petitioner's supplemental brief and reply because it contained new assignments of error that were not originally raised by petitioner. *See* Rule 10 of the West Virginia Rules of Appellate Procedure.

1

affair that petitioner had with one of the State's witnesses. By order entered October 14, 2010, this Court affirmed the Circuit Court of Jackson County's sentencing order. *See State v. Mahood*, 227 W.Va. 258, 708 S.E.2d 322 (2010).

In December of 2010, petitioner, pro se, filed a petition for writ of habeas corpus. Several months later, the circuit court appointed petitioner counsel. After having counsel appointed, petitioner filed an amended petition for writ of habeas corpus arguing that he was denied his constitutional right to a fair and impartial jury; denied his right to present a complete defense; that he received ineffective assistance of counsel; and that he received a more severe sentence than expected. On July 5, 2011, petitioner filed a supplemental amended petition for writ of habeas corpus. In this petition, petitioner argued that his trial counsel failed to present evidence and argument of mitigating circumstances during the non-bifurcated trial and prosecutorial misconduct.

Although still represented by counsel, petitioner, pro se, in February of 2013, filed a document titled "supplemental claims to be added to amended petition for writ of habeas corpus." By order entered February 21, 2013, the circuit court directed the State to file a response to petitioner's supplemental amended petition within thirty days. Subsequently, the circuit court held a status hearing, and upon petitioner's motion, granted petitioner an additional thirty days to file a final petition and a "Losh list" and ordered the State to file a response within thirty days.[2]

On June 18, 2013, petitioner filed a "Motion for Default Judgment" arguing that he should be granted a new trial because the State failed to file a response to his petition for writ of habeas corpus.[3] Several hours later, the State filed its answer. Following a status hearing in July of 2013, the circuit court entered an order setting an omnibus evidentiary hearing on petitioner's claim of ineffective assistance of counsel. After holding an omnibus evidentiary hearing, the circuit court denied petitioner post-conviction habeas relief by amended order entered November 20, 2013. Petitioner now appeals to this Court.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

---

[2]The checklist of grounds typically used in habeas corpus proceedings, commonly known as "the *Losh* list," originates from *Losh v. McKenzie,* 166 W.Va. 762, 277 S.E.2d 606 (1981).

[3]This Court acknowledges that record reflects that while petitioner made a motion for default judgment as to his claims against respondent, that the relief petitioner actually sought from the circuit court was for default on the issue of whether petitioner's conviction and incarceration was void under the Constitution of the United States or the Constitution of this State, not a default judgment after damages have been ascertained. Petitioner's motion sought the circuit court's ruling as to petitioner illegal imprisonment. Petitioner did not seek judgment from respondent for a sum certain. The term "default judgment" is used throughout this decision to refer to a default, simply because the language of the circuit court's order and petitioner's underlying motion uses the term "default judgment" as opposed to default. This Court recognizes the difference between a default and default judgment.

2

"In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

First, petitioner argues that the circuit court erred in denying him habeas relief because respondent failed to file a timely response to his petition for writ of habeas corpus filed on April 29, 2011. Petitioner contends that he was entitled to a default judgment because respondent failed to file its response by June 24, 2011.

Petitioner cites no legal authority to support his argument that he was entitled to a default judgment. "[T]he rules of procedure in criminal and civil cases do not apply in post-conviction habeas corpus proceedings." *Gibson v. Dale*, 173 W.Va. 681, 688 n.7, 319 S.E. 806, 813 n.7 (1984). This Court notes that respondent did not file a response to petitioner's "amended petition" by June 24, 2011, as directed by the circuit court. However, the record clearly shows that petitioner filed a supplemental amended petition for writ of habeas corpus on July 5, 2011, and a "supplemental claims to be added to amended petition for writ of habeas corpus" on February 14, 2013. Petitioner's own actions prevented respondent from filing a response to the original petition that was filed in April of 2011. The circuit court appropriately entered two additional scheduling orders directing respondent to file a response.[4] Further, West Virginia Code § 55-17-4(2), provides that "[j]udgment by default may not be entered against a government agency in an action . . . ." Accordingly, we find that the circuit court did not err denying petitioner's request for a default judgment.

Petitioner also re-asserts the same argument that the circuit court rejected. Petitioner argues that he received ineffective assistance of counsel because his trial counsel failed to investigate a diminished capacity defense. Upon our review and consideration of the circuit court's order, the parties' arguments, and record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on the error he assigns in this appeal, which was also argued below. Having reviewed the circuit court's "Amended Judgment Order," entered November 20, 2013, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions of law as to the assignment of error raised in this appeal. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

---

[4]Respondent filed a response to petitioner's supplemental amended petition and supplemental claims to be added to the amended petition on June 18, 2013.

**ISSUED:** March 16, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II

IN THE CIRCUIT COURT OF JACKSON COUNTY, WEST VIRGINIA:

STATE OF WEST VIRGINIA *ex rel.*
STEVEN MAHOOD,

      Petitioner,

vs.              //       Civil Action No. 10-C-191
                           (Thomas C. Evans, III, Judge)

COMMISSIONER,
DEPARTMENT OF CORRECTIONS,

      Respondent.

## AMENDED JUDGMENT ORDER[1]

On September 10, 2013, came the Petitioner, Steven Mahood, appearing by video/teleconference, and by counsel, D. Adrian Hoosier, II; and, the Respondent by counsel, Katherine H. Casto, Assistant Prosecuting Attorney, in and for this County and State, for evidentiary hearing on the Petitioner's various petitions for a writ of *Habeas Corpus.*

The parties were afforded an opportunity to present evidence and argument. Thereafter, the matter was submitted for decision, with the attorneys afforded the right and opportunity to present proposed orders.

Based on the foregoing, the following findings of act (found by a preponderance of the evidence) and conclusions of law are made by the Court:

## FINDINGS OF FACT

1. In *State of West Virginia v. Steven Lee Mahood,* 07-F-69, upon verdict of a Jury, the Petitioner Steven Mahood was convicted of the First

---

[1] The Court has added Sub-Section "III" under "Conclusions of Law." No other changes have been made.

1

Degree Murder of his wife, Ramona Mahood (hereinafter, referred to as "Ramona"). The Jury did not recommend mercy.

2. On November 10, 2008, the trial court denied the Petitioner's motion in arrest of judgment, motion for post-verdict judgment of acquittal, and motion for a new trial. The trial court did then proceed to sentence the Petitioner to life in the penitentiary without eligibility for parole.

3. The conviction was affirmed by the West Virginia Supreme Court in *State v. Mahood*, 227 W.Va. 258, 708 S.E.2d (2010).

4. The Petitioner has filed several petitions framing his Writ of *Habeas Corpus*: (a) *Petition*, recorded December 19, 2010; (b) *Amended Petition for Writ of Habeas Corpus*, recorded May 2, 2011; (c) *Supplemental Amended Petition for Writ of Habeas Corpus*, recorded July 5, 2011; and (d) *Supplemental Claims to be Added to Amended Petition for Writ of Habeas Corpus*, recorded February 12, 2013. These various filings will herein be referred in the collective.

5. As agreed by the parties, the primary issue raised in the various *Petitions* relates to the Petitioner's attempts to present a diminished capacity defense based on gross intoxication, at trial. During the course of the trial, the Petitioner's defense counsel[2] attempted to elicit evidence that the Petitioner was intoxicated at the time of the murder. Although evidence as to the Petitioner's state was introduced, the trial court denied counsel's request for a diminished capacity jury instruction. In so ruling, the trial court found

---

[2] Defense counsel at trial were attorneys Morgan Hayes and Lee F. Benford, II.

2

that it did "not believe that the evidence presented in this case, and reasonable inferences therefrom, would support any finding by a jury that this man was so drunk that he was incapable of deliberating or premeditating. To give an instruction would invite pure speculation by the jury with respect to this defense. ... Four beers is not a level of drunkenness so great that you lack the ability to premeditate or to deliberate." *Trial Transcript: Volume IV*, pg. 15, lines 9-16, and pgs. 15-16, lines 22-1.

6.    The trial court's denial of what is now referred to as a *"diminished capacity"* jury instruction was based on the lack of evidence presented during the course of the trial that showed that Steve Mahood was intoxicated at any time relevant to the killing of Ramona Mahood.

To better explain the ruling at trial, and the ruling contained herein, it is necessary to examine the testimony at trial.[3]

a.    At the jury trial, both Tim Tucker and Lisa Harrison Whitehouse testified that they spent time with the Petitioner and the victim, Ramona, during the evening of August 6, 2007. Ms. Whitehouse testified that the Petitioner Steve Mahood, Ramona, and Mr. Tucker (Ms. Whitehouse's step-father) arrived at her home at approximately 9:50 p.m., and left at approximately 10:30 p.m. *Trial Transcript: Volume III*, pg. 43, lines 1-4, and pg. 44, lines 6-9.

During the State's case-in-chief, Ms. Whitehouse testified that the Petitioner had a beer in his hand when he arrived at her home on that night,

---

[3] To prevent re-litigation of the jury trial, this Court does adopt the trial transcripts as evidence in the present matter.

201

and when he went to leave he got a second beer out of a cooler in the back seat of his car. *Trial Transcript: Volume III*, pg. 47, lines 1-12. During the presentation of the Petitioner Mahood's case, Ms. Whitehouse testified that she had known the Petitioner for approximately two years prior to August 2007, that during that time she had seen the Petitioner almost every day, and that the Petitioner was drinking alcohol every time she saw him, except for on two occasions. *Trial Transcript: Volume IV*, pg. 21, lines 6-17. Ms. Whitehouse also testified that on the evening of August 6, 2007, the Petitioner was "very happy," and that he "hadn't been drinking that much," *Id.*, pg. 22, lines 9-11, and pg. 23, lines 15-22. Ms. Whitehouse testified that while she had seen the Petitioner intoxicated on prior dates, he did not appear intoxicated on that particular evening. *Id.*, pgs. 23-24, lines 23-6.

b.  Mr. Tucker testified that after leaving Ms. Whitehouse's home, he went with the Petitioner and Ramona to a bar for a short period of time, and then went to Mr. Tucker's home. *Id.*, pgs. 54-55. Ramona and the Petitioner left Mr. Tucker's house at approximately midnight. *Id.*, pgs. 55-56, lines 23-3. Mr. Tucker testified that he was with the Petitioner for the evening of August 6, 2007, and during such time he witnessed the Petitioner drink "a couple" of beers, while at the Petitioner's home, and then he witnessed the Petitioner drink two more beers while at Mr. Tucker's home. *Trial Transcript: Volume III*, pg. 57, lines 2-10; and, pgs. 51-52, lines 16-10. Mr. Tucker also testified that he witnessed the Petitioner drinking one beer at a bar called "Roger's" but that he didn't see the Petitioner drinking any more after they

4

262

returned to Mr. Tucker's home. *Id.,* pg. 54, lines 20-23. Mr. Tucker's testimony was comprised of his observations of the Petitioner over the course of several hours.

      c.    Jerry Mahood (hereinafter, referred to as "Jerry"), the Petitioner's brother, testified that the Petitioner called him between 5:15 a.m. and 5:30 a.m. on the morning of August 7, 2007. *Trial Transcript: Volume II,* pg. 29, lines 15-21. At that time, the Petitioner informed Jerry that Ramona was deceased. *Id.,* pg. 30, lines 2-4. Jerry Mahood did not testify that his brother was intoxicated. Although Jerry indicated that he "thought" the Petitioner was drunk and the Petitioner sounded "real upset or drunk. And [Jerry] assumed he was drunk" when the Petitioner first called him in the early morning of August 7, 2007, Jerry never testified that his brother was actually intoxicated or under the influence when Jerry met with the Petitioner a short time later at the Petitioner's home at sometime close to 6 a.m. *Trial Transcript: Volume II,* pg. 29, lines 15-21; and, pg. 34, lines 10-15.

EMS notification was at 7:11 a.m. *Testimony of Joyce Smith,* Trial Transcript, Vol. II.

Jerry Mahood did not call 911 to notify the authorities of the victim's death; he called his wife, at work and had her call 911.

      d.    Between midnight and approximately 5:15 and 5:30 a.m. there was no evidence that any other person had any direct or indirect contact with either Ramona or the Petitioner Steven Mahood. It was during that time-frame that Ramona was murdered.

5

e.     Captain H. L. Faber of the Jackson County Sheriff's Department testified that he first interviewed the Petitioner at approximately 9:27 a.m. on August 7, 2007. *Trial Transcript: Volume III*, pg. 149, lines 20-24. At that time, the Petitioner did not appear to be intoxicated. Id., pg. 151, lines 9-11. None of the first responders to the crime scene testified that the Petitioner appeared intoxicated when they arrived at approximately 7:00 a.m. on August 7, 2007.

f.     The jury also heard the Defendant's recorded statement to police, given on August 7, 2007, **in which he denied that he was intoxicated the night of the murder.**[4]

g.     The Petitioner called to the stand his cousin, James Westfall, and his high school friend, Matthew Rice, both of whom testified as to the Petitioner's drinking habits. Mr. Westfall indicated that the Petitioner lost a job two weeks prior to the murder, due to the Petitioner's drinking, and Mr. Rice testified that the Petitioner "drank a little bit too much", but that he had not seen in the Petitioner in several months prior to the murder. *Trial Transcript: Volume IV*, pgs. 28 and 33. Neither Mr. Westfall nor Mr. Rice saw the Petitioner on August 6 or 7, 2007.

h.     The Petitioner did not testify at his jury trial.

2013 NOV 20 PM 2:34 BRUCE W. DEWEES JACKSON COUNTY CIRCUIT CLERK RIPLEY WV 25271 RECORDED

---

[4] Petitioner Steve Mahood also told his consulting expert witness, Dr. Bobby Miller, a forensic psychiatrist, that he was not intoxicated on the night that his wife was killed. *See Habeas transcript, Testimony of Dr. Bobby Miller.*

204

7.  At the evidentiary hearing on September 10, 2013, the Petitioner called to testify Jerry Mahood[5] and Lisa Whitehouse.[6]

a.  Jerry Mahood testified at the hearing that the Petitioner drank "a lot," and that he witnessed the Petitioner drinking on several occasions. Jerry testified that he knew that the Petitioner had been fired for drinking, and that the Petitioner would have up to 24 beers at a time, though never less than two. The Petitioner's demeanor would "sometimes" change when he drank. Jerry testified that when the Petitioner was drinking whiskey and using "dope," he would "get crazy," but that he "never" becomes violent when he is only drinking beer.

Jerry Mahood admitted that he was not around his brother prior to Ramona's murder, and <u>he did not know whether the Petitioner was drinking on August 6, 2007</u>. Jerry said that when the Petitioner called him the morning of August 7, 2007, the Petitioner seemed very upset, was mumbling, and Jerry hung up the telephone, because he thought the Petitioner was drunk. However, when the Petitioner called back approximately five minutes later, it was easier to understand him.

Regarding the credibility of Jerry Mahood, it must be understood that there was what appears from the evidence to have been an effort to "sanitize" the crime scene and the victim's body, prior to the arrival of law enforcement.

---

[5] Jerry Mahood's testimony was impeached pursuant to Rule 609(a)(2)(A) of the West Virginia Rules of Evidence due to his prior felony conviction for murder.

[6] At hearing, Lisa Whitehouse stated that she was married, and her legal name is Lisa Rhodes. However, to minimize confusion, this Court will continue to refer to her by her trial name of Lisa Whitehouse.

7

See *Testimony of Dep. Sheriff Anthony Boggs*, Trial Tr. Vol. II, pp. 167-189; *Testimony of Investigating Officer Herbert Faber*, Trial Tr., Vol. II, pp. 243-244. The victim's clothes (including her socks) were changed, she was arranged on the couch, with a mattress pad placed on her like a blanket and pulled up to her head, and, significantly, the clothes that the victim was wearing during the attack were soaked with water and lying next to a washing machine. There were wet, bloody washcloths found on a table near the couch where the victim was found. There also appears that items containing blood were discarded into a trash receptacle. *Trial Testimony of Anthony Boggs, Id.*

Jerry Mahood denied in his habeas testimony that he "sanitized" or assisted his brother in attempting to "sanitize" the crime scene. It's clear that someone attempted to clean up or "sanitize" the crime scene, and according to all of the testimony, the Petitioner Steve Mahood was very emotional at the time, crying, hugging the victim and the like. Jerry Mahood did not fully explain in his testimony what he was doing during the time period after he got to the scene and when 911 was called at 7:11 a.m. Due to the relationship of Jerry Mahood to the Petitioner and his unexplained presence at the crime scene for what appears to be 1 hour and 11 minutes prior to notification of the authorities, together with evidence of obvious efforts by one or more persons to clean up the scene, the court ascribes little or no credibility to the testimony of Jerry Mahood.

b. Ms. Whitehouse testified at the hearing that she only saw the Petitioner have two drinks during the 40-45 minute timeframe that she

8

saw him on the night of August 6, 2007. She testified that he was not drinking anything other than beer. She testified that she had seen the Petitioner drinking approximately seventy-five times over the course of knowing him, but that he only got intoxicated approximately three or four times. Ms. Whitehouse considered drinking to passing-out to qualify as intoxication. She said that there were only a couple of times when he was drink to the point of stumbling. She further testified that the Petitioner's behavior never changed when he was drinking, and that he was always "happy" when she saw him.

8.     At the evidentiary hearing, the Court also heard from Dr. Bobby Miller, M.D. Dr. Miller was retained by defense counsel to evaluate the Petitioner prior to trial. The purpose of the evaluation was to determine whether the Petitioner was competent to stand trial, and to offer an opinion relating to criminal responsibility. Based on Dr. Ralph Smith's records, the Petitioner's criminal record, and a full evaluation of the Petitioner, Dr. Miller informed Mr. Benford that defense counsel should not call him to testify at trial, as he would not be able to assist in the defense. Dr. Miller testified that he had a vivid recollection of his interview of the Petitioner. During his interview with the Petitioner, the Petitioner informed Dr. Miller that on the night of the murder he was "drinking but not anymore than usual," and that the Petitioner admitted that he knew what he was doing, even though he had been drinking. Dr. Miller was not able to find that the Petitioner had amnesia

9

207

or an inability to recall the events of that night, or that he was suffering from extreme emotional distress at the time.

9.    Dr. Miller's testimony was corroborated by the testimony of Lee F. Benford, II. Mr. Benford testified that he and co-counsel for Steve Mahood had explored the diminished capacity defense by having the Petitioner evaluated by Dr. Miller. The evaluation generated by Dr. Miller was solely for the benefit of the defense, and was not meant to be shared with the trial court or the State, unless the defense so decided. Mr. Benford testified that based on Dr. Miller's evaluation the defense chose not to disclose the report, or to employ Dr. Miller as an expert. Despite not having an expert, counsel still attempted to put on evidence that the Petitioner was intoxicated at the time. Mr. Benford testified that there were several people who testified about how much the Petitioner drank the night of the murder, as well as the Petitioner's proclivity for drinking in general. Mr. Benford testified that over the course of his career he has tried several murder cases in various counties, but has never been successful in a diminished capacity defense.

10.    At the evidentiary hearing, the Petitioner testified on his own behalf. The Petitioner testified that he had begun drinking at 9 or 10 a.m. on August 6, 2007. He testified that he continued drinking until around midnight, and that he was drunk. The Petitioner said that he after dropping off Mr. Tucker at his house, he and Ramona returned to their home. Shortly after arriving home, he and Ramona got into a verbal argument, at which time Ramona admitted that ten years prior, during a separation, she had sexual

10

205

relations with another man and that this statement - - her admission of infidelity happening many years prior - - is "what set him off."

During his account, the Petitioner was able to explain exactly how the argument began, who said what -- including exact quotes (Ramona said, "What if it was me?"/Ramona said she was do it again if it taught the Petitioner a lesson) -- and in general, a significant amount of detail about the verbal disagreement. However, the Petitioner claimed that he did not remember a single other act until such time as he threw his wife, and her head bounced off a dresser. The Petitioner claims that he did not realize what he had done, and tried to get her to come to, but she was not breathing. The Petitioner testified that he was intoxicated at the time of the murder and suffers from amnesia. He denied strangling Ramona, inserting a foreign object forcibly into her rectum, slamming her repeatedly against their car, beating her against the refrigerator in their kitchen, or causing any of the other multiple injuries on her. The Petitioner denied changing her clothes.

While Petitioner Steve Mahood, in his testimony, acknowledged that he was present at the trial, and heard the substantial physical evidence relating to the brutal death of his wife, he testified at the habeas hearing that he did not remember anything after the verbal argument, except for Ramona banging her head on the dresser.

The Petitioner also testified that he did not authorize his attorneys to tell the jury that he was responsible, but was intoxicated at the time of the murder.

11

BRUCE W. DEWEES
JACKSON COUNTY
CIRCUIT CLERK
RIPLEY WV 25271
2013 MAY 20 PM 2:34
RECORDED

209

11. Although the primary issue in the instant habeas case relates to the diminished capacity defense, there was also some testimony at the hearing regarding general ineffective assistance of counsel, especially in regards to testimony by the medical examiner, James Kaplan, M.D., that Ramona was sexually assaulted contemporaneously to her murder.[7]

a. Mr. Benford testified that he and Mr. Hayes met with the Petitioner on several occasions, and that whenever the Petitioner gave them the name of potential witness Mr. Benford and Mr. Hayes would locate that witness and go speak with that individual in person.

b. Mr. Benford testified that Dr. Kaplan was not cross examined at trial, because there was no basis to refute his findings. Moreover, there was a concern of counsel that cross examination would help to ingrain Dr. Kaplan's testimony further in the minds of the jury.

## CONCLUSIONS OF LAW

### I. TRIAL COUNSEL DID NOT PROVIDE INEFFECTIVE ASSISTANCE IN REGARDS TO THE DIMINISHED CAPACITY DEFENSE.

In his various *Petitions*, the Petitioner raises three grounds for granting his Writ for *Habeas Corpus*: (1) the trial court violated the Petitioner's rights by refusing to give a voluntary intoxication jury instruction; (2) trial counsel was ineffective in that they failed to notice the State of a diminished capacity defense; and (3) trial counsel was ineffective in that they failed to get an

---

[7] At the jury trial, Dr. Kaplan testified as to his findings of the victim's cause of death, and the state of her body at the time of death. In his testimony, Dr. Kaplan testified that it appeared as though somebody had inserted an object into the victim's rectum "in a forceful manner before she died." *Trial Transcript: Volume II*, pg. 151, lines 3-11.

12

expert to prove said defense. At the evidentiary hearing, the Petitioner largely conceded that the primary issue was that trial counsel failed to present evidence of a *diminished capacity* defense, such that the trial court had no choice but to deny giving the instruction.

On all grounds asserted, this Court finds that the Petitioner has failed to prove his case by clear and convincing evidence.

While Petitioner's counsel has referred to failure of trial counsel to pursue a "diminished capacity" defense, in fact, there is no evidence that at the time of the crime, the Petitioner was suffering from mental disease or defect.

In fact, the jury instruction refused during the trial related to the "intoxication" defense to first degree murder.

The latest precedent relating to the "intoxication" defense to first degree murder, is *State v. Skidmore*, 228 W.Va. 166, 718 S.E.2d 516 (2011). In syllabus pt. 2, the court stated:

2. "Voluntary drunkenness is generally never an excuse for a crime, but where a defendant is charged with murder, and it appears that the defendant was too drunk to be capable of deliberating and premeditating, in that instance intoxication may reduce murder in the first degree to murder in the second degree, as long as the specific intent did not antedate the intoxication." Syllabus Point 2, *State v. Keeton*, 166 W.Va. 77, 272 S.E.2d 817 (1980).

It is plain to this court that trial counsel was not ineffective in failing to present a defense of "diminished capacity" or mitigation evidence relating to "gross intoxication." The evidence presented at the trial and before this court in the habeas hearing, except for the habeas testimony of Steve Mahood, does

13

not establish that Mahood was grossly intoxicated sufficient for the court to give the requested instruction. Steve Mahood made the decision not to testify at the trial, and there is no suggestion here that his decision was involuntary.

There is absolutely no evidence shown to the court at the Jury trial or at the Habeas hearing, that Petitioner Mahood was suffering from mental disease or defect sufficient to make out a jury issue on "diminished capacity."

As for trial counsel's failure to obtain an expert, at the evidentiary hearing it was undisputed that the defense *did* seek out an expert, but that the expert in question was unable to provide a favorable report. Dr. Miller and Mr. Benford both testified that they consulted following Dr. Miller's interview of the Petitioner, and it was mutually agreed that calling Dr. Miller to testify would, if anything, be detrimental to the Petitioner. In fact, Dr. Miller's recollection of the interview was that the Petitioner admitted to having a full recollection of murdering his wife, and admitted that he was solely and completely responsible for her death. The case law requires expert testimony before a diminished capacity defense is available. However, trial counsel in this case could not have called their expert to testify, unless they wanted to assure: (a) that their client was convicted; and/or (b) that the trial court denied their request for a diminished capacity defense.

After listening to the Petitioner's explanation of the murder, this court is even more skeptical of the Petitioner's claims of intoxication. The Petitioner's recollection of that night was crystal clear -- up until the point that he became severely, inhumanely, murderously abusive towards his wife. Dr.

14

Kaplan testified at trial that there were two causes of death, two acts of which either one could have and would have resulted in Ramona's demise: one was a head injury, and the other was manual strangulation. *Trial Transcript: Volume II*, pgs. 148-149. Such severe rage indicates concentrated efforts, not hapless intoxication.

That the Petitioner can vividly describe the verbal argument which precipitated the murder - - including a recollection that he was extremely angry with his wife for her alleged prior infidelity - - but could not remember the murder itself is simply not credible.

Dr. Miller -- the Petitioner's own expert -- was not convinced that the Petitioner suffered from amnesia -- alcohol-induced or otherwise -- at the time that he murdered his wife. This Court agrees with Dr. Miller's assessment. Even the Petitioner's assessment that he was not intoxicated to the point of being responsible is refuted by his own expert and by his own account of the murder.

II.  **TRIAL COUNSEL DID NOT PROVIDE INEFFECTIVE ASSISTANCE WHEN IT FAILED TO OBJECT TO REFERENCE TO THE VICTIM BEING SEXUALLY ASSAULTED.**

In his testimony, the medical examiner, Dr. Kaplan, testified that it appeared as though somebody had inserted an object into the victim's rectum "in a forceful manner before she died." Trial Transcript: Volume II, pg. 151, lines 3-11. Petitioner claims that failure to object by trial counsel to a reference that the victim had been sexually assaulted was ineffective assistance of counsel warranting a new trial. This claim is rejected. If an

15

BRUCE VANDEWEGHE
JACKSON COUNTY
CIRCUIT CLERK
13 NOV 20 PM 3:35
RECORDED

objection had been made by trial counsel, it would have overruled, because the testimony is highly relevant to essential material elements of the charge of murder of the first degree and murder of the second degree.

In *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996) the defendant was convicted of first degree murder, without a recommendation for mercy, for the beating death of his eighteen-month-old son. At trial, the Chief Medical Examiner testified that the child had "multiple bruises of varying ages," including a skull fracture and a related hemorrhage "which occurred about ten to fourteen days prior to the child's death." *Id.,* 196 W.Va. 294, 302. On appeal, the defendant argued that the evidence of "prior bad acts" should have been excluded as being more prejudicial than probative. Succinctly, the Court rejected the claim, ruling that the "balancing of probative value against unfair prejudice is weighed in favor of admissibility," and evidence should be viewed "in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effects." *Id.,* at 312. *See also State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999). The Court found that the evidence of prior beatings "not only demonstrated the motive and setup of the crime but also was necessary to place the child's death in context and to complete the story of the charged crime." *Id.* The Court reasoned that Rule 403 of the West Virginia Rules of Evidence

> was not intended to prohibit a prosecutor from presenting a full picture of a crime.... Nor does Rule 403 force a prosecutor to eliminate details of a killing or the degree of malevolence exhibited by a defendant to his victim causing a victim's death. We find the

16

214

testimony was so highly probative that any possible prejudice evaporated in comparison to it.

*State v. LaRock,* at 312.

Although the Court in *LaRock* was reviewing the evidence as admissible under Rule 404(b) of the West Virginia Rules of Evidence for "prior bad acts", the Court acknowledged that it was just as likely that the evidence was admissible as intrinsic evidence.

Even though the Petitioner relies on Rule 103 of the West Virginia Rules of Evidence, claiming that the evidence was wholly inadmissible, this act of sexual intrusion was contemporaneous with the murderous assault made by Petitioner upon his wife. At the very least, this evidence shows the degree of malevolence of Petitioner towards his wife. This evidence is highly relevant on the issue of <u>malice</u>, an essential element of murder.

Trial counsel could not have acted outside the objective standard of reasonableness, when they failed to object to admissible evidence of the sexual assault and the broken ribs. This Court finds that trial counsel did not act unreasonably in failing to ask for a mistrial when the trial court overruled their objection to the admission of the autopsy report.

III. **ALL OTHER GROUNDS SET FORTH IN THE VARIOUS PETITIONS ARE INSUFFICIENT TO SUSTAIN THE WRIT OF HABEAS CORPUS.**

In his various petitions, the Petitioner set forth multiple other grounds for granting his Writ of *Habeas Corpus.* The Court will address each one, in turn:

215

RECORDED
2013 NOV 20 PM 2: 35
BRUCE W. DEWEES
JACKSON COUNTY
CIRCUIT CLERK
RIPLEY WV 25271

A.    **Fair and Impartial Jury** – The Petitioner was not denied his right to a "fair and impartial jury," as alleged in Paragraph IV-1 of his *Supplemental Amended Petition*, dated June 30, 2011. A review of the trial transcripts reveals that the jury was adequately screened for any potential bias resulting from any trial publicity. Each juror who indicated a prior knowledge of the case was individually questioned. For instance, one juror indicated that he read a single story about the case in *The Jackson Herald*, but that it was "probably" a year or longer prior to the trial, and that he had not read anything that would affect his ability be impartial. *Trial Transcript: Volume I,* pgs. 151-153.

To further address the matter of the media, following the impaneling of the jury, the trial court carefully instructed the jurors not to watch television, read the newspaper, or to read local news on the Internet. *Trial Transcript: Volume I,* pg. 228, lines 12-24. The trial court thoroughly cautioned the jurors against reading or watching any news media, telling the jurors to "[j]ust forget the media," and to not discuss the case with anybody, including spouses. *Id.*

Petitioner has failed in his burden of proving this ground for habeas relief.

B.    **Mitigation Evidence** – In Paragraph IV-4 of the *Supplemental Amended Petition,* the Petitioner alleges that his trial counsel failed to present mitigation evidence during the trial. Similarly, in Paragraph V of the *Supplemental Claims to Petition,* dated February 12, 2013, the Petitioner

alleges that his trial counsel failed to ask the jury to grant mercy. The Court finds no merit to either contention. At trial, defense counsel explicitly asked the jury to grant the Petitioner mercy in the event of a conviction. *See, Trial Transcript: Volume IV*, pages 103-104, and 112. The Petitioner also claims that trial counsel erred in not requesting mercy from the court at sentencing.

Further, trial counsel attempted to elicit mitigation through the failed diminished capacity or intoxication defense. By attempting to show that the Petitioner was intoxicated at the time of the killing, the defense was providing mitigation for the act itself. At the hearing on the various petitions, the Petitioner did not indicate that there was any other evidence which could have been presented to the jury as a means of mitigation. There were also no questions posed to trial counsel, Mr. Benford, regarding the defense decision not to move to bifurcate the guilt and mercy stages of the trial. The Court finds that there was no evidence that trial counsel was ineffective in regards to the presentation of mitigation, or by failing to bifurcate the trial.

There is no showing that mitigation evidence existed and was available to counsel at the trial that counsel neglected to offer.

C. **Excessive Sentence** – In Paragraph IV-5 of the Supplemental *Amended Petition*, the Petitioner alleges that his sentence was excessive. There can be no mistake that the Petitioner's sentence was to the letter-of-the-law, pursuant to West Virginia Code, § 63-3-15, which mandates imprisonment in the penitentiary for life, when the jury returns a verdict of "guilty" for murder in the first degree, without a recommendation for mercy.

19

D.    Prosecutorial Misconduct – In Paragraph IV-6 of the *Supplemental Amended Petition*, the Petitioner alleges prosecutorial misconduct. The exact issues which the Petitioner alleged as prosecutorial misconduct have already been addressed by the West Virginia Supreme Court, in the direct appeal of the Petitioner's conviction, in *State v. Mahood*, 227 W.Va. 258, 708 S.E.2d (2010). This Court does not find it necessary to restate the findings of the State Supreme Court.[8] This ground is denied.

E.    **Court Questioning of Witness** – In Paragraph I of the *Supplemental Claims to Petition*, the Petitioner alleges that trial counsel was deficient in performance when they failed to object to the trial court's questioning of witnesses. Rule 614 of the West Virginia Rules of Evidence states that the "court may interrogate witnesses, whether called by itself or by a party, but in jury trials the court's interrogation shall be impartial so as not to prejudice the parties." In this case, the trial court's questions were neutral in content, and did not betray a preference for the State or the defense. The questions were asked after the State and the defense had completed their questioning. Asking Deputy Varney whether the Petitioner was wearing a long-sleeved shirt or a short-sleeved shirt when he leaned against the car, or asking Sergeant Wolfe for a more precise location for where an exhibit was

---

[8] In *State v. Mahood*, the West Virginia Supreme Court did not reach a ruling on the specific issue of prosecutorial misconduct. However, the basis for the Petitioner's appeal is factually identical to the ground presented in his *habeas corpus* petition. Thus, the Court finds it appropriate to rely on the State Supreme Court's analysis of the prosecutor's conduct.

The Petitioner's argument is without merit. The Petitioner claims that Mr. King referenced the Petitioner's prior criminal history, but that is simply incorrect. Even from the relevant testimony cited by the Petitioner, Mr. King never says that he matched the Petitioner's fingerprints with fingerprint in AFIS, simply that he did compare the fingerprints found at the scene with AFIS. Furthermore, Mr. King did not testify as to where the database of fingerprints comes from: he did not say whether the AFIS database was comprised of fingerprints of convicted felons, or fingerprints provided by the Department of Motor Vehicles. The exchange between trial counsel and Mr. King might have come close to crossing the line, but ultimately, it did not, and was within the trial court's directive as to how Mr. King could testify on the matter. Therefore, trial counsel did not act unreasonably in its questioning of Mr. King.

G.    **Cumulative Evidence** -- In Paragraph VI of the *Supplemental Claims to Petition*, the Petitioner alleges that the "cumulative effect" of trial counsel's errors, as set forth in the various petitions, amounts to ineffective assistance of counsel. Because the Court has methodically set forth the reasons for which the Petitioner's claims of ineffective assistance of counsel are without merit, the Court does not find a basis for this ground.

H.    **Other Grounds** -- After careful review of the various petitions, the Court is of the belief that it has addressed all substantive claims presented by the Petitioner.

22

BRUCE W. DEWEES
JACKSON COUNTY
CIRCUIT CLERK
25271

2013 NOV 20 PH 2: 35

RECORDED

Based on the foregoing, it is **ORDERED** that Petition, together with Amended and Supplemental Petitions, for a writ of Habeas Corpus be and the same are hereby denied. Petitioner's exception to this ruling is saved.

The Clerk shall forward attested copies of this order to the Prosecuting Attorney and Adrian Hoosier, counsel for Petitioner.

All of which is **ORDERED**, accordingly.

ENTER: November 21, 2013

_____
Thomas C. Evans, III, Circuit Judge

RECORDED
2013 NOV 20 PM 2: 35
BRUCE W. DEWEES
JACKSON COUNTY
CIRCUIT CLERK

ENTERED THE _____ 20 _____ DAY OF
_____ November 2013 _____
ORDER BOOK _____ 111 _____ PAGE
6.75
Bruce W. Dewees
CLERK CIRCUIT COURT

23